## SHANBARKER *v.* DALTON

[No. 373, September Term, 1967.]

*Decided November 6, 1968.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, BARNES, FINAN, SINGLEY and SMITH, JJ.

*Bill L. Yoho,* with whom were *Robert S. Hoyert, Roy W. Hooten, Joseph F. McBride* and *Hoyert, Yoho & Hooten* on the brief, for appellant.

*Edward L. Foster* for appellee.

MARBURY, J., delivered the opinion of the Court.

On November 7, 1967, the Circuit Court for Prince George's County awarded custody of a minor child of the parties to this action to the father, custody previously having been granted to the mother. From that court's order, the mother appealed.

The appellant mother, Margaret A. (Dalton) Shanbarker, and the appellee father, Robert E. Dalton, were married on June 21, 1954. Their son, Douglas Dalton, whose custody is the subject of this appeal, was born on July 4, 1961. On March 23, 1964, the Daltons entered into a property settlement which set out that the parties had voluntarily agreed to live separate and apart on or about August 15, 1963. In August 1965, the mother filed suit for divorce on the ground of voluntary separation for

the statutory period. A decree was entered on November 2, 1965, divorcing the parties a vinculo matrimonii and granting custody of Douglas to his mother.

In August 1964, the appellant first met Richard Shanbarker and began to see him socially prior to her divorce. Around November 1, 1966, appellant and Douglas moved into the Wheaton House Apartments with Mr. Shanbarker, where she and Shanbarker shared the same bedroom. During this period Richard Shanbarker was married to another woman. Appellant and Shanbarker vacated their apartment on August 28, 1967. Two days later, the Circuit Court for Montgomery County signed a decree divorcing a vinculo matrimonii Shanbarker and his former wife on grounds of voluntary separation. On September 1, 1967, appellant and Shanbarker were married and presently reside in Winter Park, Florida.

On appeal the appellant raises four questions: (1) should the court have entertained the within petition for custody after being informed of the manner by which the appellee received certain information; (2) did the lower court err in awarding custody to the father of a minor child when the facts of the case indicate that the child had been in the mother's custody since birth and that the mother was a fit person to have custody; (3) did the lower court err in failing to consider the best interests of the child; and (4) should the lower court have allowed the mother to testify to her present state of mind, *vis-a-vis* her previous misconduct.

The first question does not directly concern the merits of the case, but this Court deems it appropriate to consider the propriety of the actions of the appellee's counsel. Appellant urges that the lower court should have dismissed the appellee's petition because it was brought as a result of the disclosure of confidential information gained by appellee's attorney acting in a quasi-judicial capacity. We find no merit whatsoever in this contention. Briefly, the facts pertaining to this aspect of the case are as follows: The appellee's attorney is an Examiner and Master in Chancery in the Circuit Court for Montgomery County. While he was acting in that capacity, a divorce case was scheduled to come before him. The parties to that case were Shanbarker and his former wife. Prior to the date set for the

hearing of that case, Mr. Dalton visited his attorney and told him that his former wife was going by the name of Shanbarker. A few days after that visit a petition for change in custody was filed in this case. Appellant maintains that the action of the appellee's attorney in informing his client of the impending divorce case was a violation of his duties as master. In fact, in early November 1967, the Grievance Committee of the Bar Association of Montgomery County received a complaint from the appellant charging appellee's attorney with a breach of professional ethics. After the complaint was fully investigated by the grievance committee, its chairman, on January 24, 1968, sent the appellant a letter which provided in pertinent part as follows:

> "Following receipt of your complaint dated November 1, 1967, filed against Edward L. Foster, Esquire, a Maryland attorney with offices in Silver Spring, Maryland, the Grievance Committee of the Montgomery County Bar Association investigated the allegations contained therein and reviewed the appropriate Court files.
>
> "As a result of its investigation, the Committee concluded that Mr. Foster obtained no information in his judicial capacity of Master which was not available to any other attorney or interested party. Accordingly, the Committee found that there was no improper action indicated and contemplates no further proceedings in this matter.
>
> > Very truly yours,
> > /s/ William A. Volkman, Jr.
> > William A. Volkman, Jr.
> > Chairman, Grievance Committee"

Because of the seriousness of the charge, the appellee's counsel included in his brief an affidavit of Robert E. Dalton explaining the origin of the custody case. Pertinent parts of Mr. Dalton's affidavit are as follows:

> "I consulted Mr. Foster on both the 21st of August, 1967, on the telephone, and in person in his of-

fice on the 22nd of August, 1967, with the intention of instructing him to proceed against my former wife, to obtain the custody of my son due to strong suspicions on my part that she may have been living with the man to whom she is now married for more than a year prior to the time I went to see Mr. Foster in August. My former wife and Mr. Shanbarker were not married until September 1, 1967. . . . Another reason for my taking this action and instructing Mr. Foster to do so on my behalf, was the fact that when I learned on August 20, 1967, that my former wife was going to move to Florida with my son approximately eight or ten days later it was necessary for me to take this action because my son would be too far away for me to see and visit and he would be effectively lost to me.

"After I informed Mr. Foster of the above situation, he noted that he had for hearing the case of Shanbarker *v.* Shanbarker. Mr. Foster immediately, in my presence, called the courthouse and spoke to someone, indicating that he could not hear that case. In addition he called the attorney for the plaintiff in the Shanbarker case and informed him he could not hear the case and was returning it to court. Mr. Foster had never, in any way, indicated to me that he had for hearing before him, or that there was pending, a divorce case of Shanbarker *v.* Shanbarker, until after I had discussed with him the matters set forth in this affidavit, and had told him that I wanted him to proceed in Court on my behalf to attempt to get the custody of my son."

After appellant's counsel raised this point before the lower court and appellee's attorney explained what had happened, Judge Parker stated: "I don't see anything improper about that." We agree with the lower court and hold that appellee's counsel acted with entire propriety. The information which he disclosed was not confidential in nature. Indeed, even the appellant admits that the records of the divorce proceeding are *public* records.

Turning to the other issues presented by the appellant, we deal with the appellant's questions (2) and (3) together by which she submits that the lower court placed too much emphasis upon the relationship of the mother and Shanbarker in determining the best interests of the child. It is a well established principle of law in Maryland that what is best for the child is the determining factor in custody cases. *Breault v. Breault,* 250 Md. 173, 242 A. 2d 116; *Heaver v. Bradley,* 244 Md. 233, 223 A. 2d 568; *Andrews v. Andrews,* 242 Md. 143, 218 A. 2d 194; *Daubert v. Daubert,* 239 Md. 303, 211 A. 2d 323; *Bray v. Bray,* 225 Md. 476, 171 A. 2d 500. In many cases, where a divorce was granted upon the ground of adultery the custody of children of such a marriage has been granted to the innocent party, not as a punishment, but because of an assumption that they will be reared in cleaner, more wholesome moral surroundings. *Bray v. Bray, supra; Swoyer v. Swoyer,* 157 Md. 18, 145 A. 190. In other cases, this Court has indicated that if a parent has committed adultery, a strong presumption arises that the parent is not a fit and proper person to have custody. *Palmer v. Palmer,* 238 Md. 327, 207 A. 2d 481; *Wallis v. Wallis,* 235 Md. 33, 200 A. 2d 164. However, the rule is not absolute, *Wood v. Wood,* 227 Md. 112, 175 A. 2d 573; *Oliver v. Oliver,* 217 Md. 222, 140 A. 2d 908; and may be overcome by a strong showing of facts and circumstances that the parent is a fit and proper person to have custody. *Palmer v. Palmer,* and *Bray v. Bray,* both *supra.* In several cases custody has been awarded to an adulterous parent. *E.g., Pratt v. Pratt,* 245 Md. 716, 228 A. 2d 611; *Miller v. Miller,* 245 Md. 711, 228 A. 2d 311; *Cornwell v. Cornwell,* 244 Md. 674, 224 A. 2d 870; *Wood v. Wood,* and *Oliver v. Oliver,* both *supra.*

Appellant urges that her conduct was not adulterous because while she was living with Shanbarker she was a single person. Regardless of legal hair-splitting on the definition of adultery, what matters is the moral climate of the home in which young Douglas was present.

In the instant case, it is manifest that Judge Parker placed too much stress upon the illicit conduct of the appellant and Shanbarker and failed to give proper consideration to all of the circumstances that must be considered in determining what is

best for the child's welfare. The chancellor was entitled to give weight to this indiscretion but it was not determinative of the case. As this Court set out in *Ouellette v. Ouellette,* 246 Md. 604, 608, 229 A. 2d 129, 131:

> "On the contrary, where a mother, who having committed adultery, has ceased the adulterous relationship, changed her way of living and demonstrated that she is a fit and proper person to raise the children in a clean and moral atmosphere, her past indiscretions may be overlooked in considering an award of custody because the primary consideration, even in cases involving an adulterous spouse, is the best interest and welfare of the children." (Citing cases.)

According to his father's testimony, Douglas has been well cared for by his mother and she has provided him with the proper religious training. Although there was no medical testimony, appellant testified that her son has an allergic condition requiring a special diet and proper medication. Appellee, however, testified that he has done nothing about keeping up with the allergy problem during the times when the child was in his custody since he thought that the child was not sick.

The mother urges that she and her new husband would provide the child with a stable home in Florida, and that she would not be working and would be able to care for the child during the day. The father works and must place the child in a day care center. At trial there was testimony that he had lived in at least ten places since he separated from the appellant, and was presently living in a one-bedroom apartment. The father is an avid bowler and belongs to three leagues which require him to be out three night a week. He testified that he would do his best in bringing the boy up in a good environment and providing him with the proper educational and religious training. Mr. Dalton was also disturbed because his son seemed confused as to who was his actual father because he had referred to Mr. Shanbarker as "Daddy Dick". Mrs. Barbara Woolson, appellant's brother's wife and Douglas' godmother, testified that she and her husband would take care of the child if the court wanted to change custody. The Woolsons have two small children, and

live in a three-bedroom home, which has a large fenced-in back yard.

The determination of Douglas' custody should have been deferred until after further evidence was developed concerning the living conditions existing in the respective parties' homes. Such evidence might include investigations and reports of qualified social agencies concerning these conditions, as well as the environment in the Woolsons' home or other possible alternative placement of the child. See *Ouellette v. Ouellette, supra; Jester v. Jester,* 246 Md. 162, 228 A. 2d 829. After the taking of further evidence the chancellor will be in a better position to determine what is in the best interests of the child. In this regard, in her 4th contention appellant urges that the lower court should have allowed her to testify as to her present state of mind *vis-a-vis* her previous misconduct. Appellant says that had she been allowed to answer such a question it would have been clear that she was truly penitent of her improper conduct and that it would not be repeated. We agree that the mother's present attitude toward her past misconduct is a relevant factor to be considered and that the question should have been allowed to be answered. See *Bray v. Bray, supra; Parker v. Parker,* 222 Md. 69, 158 A. 2d 607.

In view of what has been stated above, the order of November 7, 1967, changing the custody of the child will neither be affirmed nor reversed and the case will be remanded to the lower court for further proceedings in accordance with this opinion.

> *Order neither affirmed nor reversed and case remanded for further proceedings in accordance with this opinion. Costs to be paid by appellee.*