HELEN L. WIDDOES *v.* ROBERT C. WIDDOES

[No. 586, September Term, 1970.]

*Decided June 8, 1971.*

The cause was argued before ORTH, MOYLAN and POWERS, JJ.

*Joseph I. Pines,* with whom were *Max R. Israelson* and *S. Michael Floam* on the brief, for appellant.

Submitted on brief by *William B. Evans* for appellee.

ORTH, J., delivered the opinion of the Court.

Robert C. Widdoes (appellee) filed a Bill of Complaint against Helen L. Widdoes (appellant) on 6 August 1969 in the Circuit Court for Cecil County praying for a divorce a vinculo matrimonii and for custody of the minor children of the parties, Charles Carson Widdoes, age 16, and Gerald Kevin Widdoes, age 6, both, according to the Bill, in the custody of the father. The ground alleged was adultery. In her Answer appellant denied committing adultery and averred that Gerald had been in her custody since the separation of the parties, she having previously filed suit in said court praying for the child's custody and that in said case appellee was ordered to pay her the sum of $20 per week for support of the child. The matter came on for hearing before the court and on 17 August 1970 it was ordered that appellee be divorced a vinculo matrimonii from appellant and that he be awarded custody of the two children with reasonable visitation rights in appellant, specifically on the first and third weekends of each month, each visitation to extend from 5:00 P.M. on Fridays until 8 P.M. the following Sunday. On appeal appellant's questions go only to the award of the custody of Gerald.

The case was heard on 24 February 1970. At the close of all the evidence and after argument by counsel, the

court observed that there were two issues, "The one of the divorce and the other of custody of the seven year old child." It said it had no difficulty with the first and stated the reasons:

"The law of Maryland is that where one has the desire plus the chance or the opportunity plus the inclination as it is sometimes put to commit adultery, then that person can't blame the Court if in deciding that adultery has been committed the Court may be wrong. The desire can be evidenced by sitting close together in the car, necking and petting which was the testimony in this case. The opportunity or the chance of course is anytime that a couple is alone long enough to have sexual intercourse; and of course the undisputed evidence in this case is that on the night of * * * July 31, the wife was alone with Loomis [her alleged paramour] for two and a half hours in the apartment. This is not disputed, so under those circumstances the Court will grant a divorce of Vinculo Matrimonii to the husband, Robert C. Widdoes and will sign a decree."

The court held the matter of the custody of Gerald sub-curia.[1] In the meantime he was to remain with the mother and to be supported by the father.

---

1. The court said:

"The question of custody I want to hold sub-curia for the time being in order that I may read more law on the subject. The general proposition of law in this area is that where the husband is a fit and proper custodian the child goes with the husband in the case of adultery on the part of the mother. This is not an open and shut matter as Mr. Evans has pointed out in argument. Every case must be decided on its own. I want to read as many cases as I can on the subject. I will appreciate any cases that Counsel has on either side on the subject that they might call to my attention, because it is a very grave step, whatever the Court does. Whatever I do, is not going to be with regard to the father or the mother in this case, but what is best for this little seven year old boy. It is a very serious mat-

On 17 August 1970 an evidentiary hearing was conducted on the issue of the custody of Gerald. Appellee testified that on one occasion, in June 1970, he had observed one Eugene Loomis leave appellant's apartment at 2:00 A.M. and that on other occasions, the dates of which he did not remember, he had seen Loomis pick her up in front of her apartment, but not late at night. He said that if the court awarded him custody he had "three sisters, a sister-in-law" who could take care of the boy. A sister, Ruth Cole, had kept the child for six years, staying with her while appellant worked. There was some evidence adduced about appellee seeing a divorcee, Elizabeth Beam. He said he was trying to sell her a car but also said that he had "talked with her and discussed divorce. Her husband went away with a bowling alley tramp and is $700 back in her support. That is the reason she can't buy a car from me." He had taken her to a ball game with her son and had dinner at her house in the presence of her son and daughter. On cross-examination he said he had been to visit her at her home in Wilmington "quite a few" times and that he saw her quite often, about two or three times a week. On cross-examination appellee said that the night before the hearing appellant beat him up and then had him arrested. On inquiry by the court it was elicited that appellee works until 8:00 P.M. three nights a week, Monday, Wednesday and Friday and that he works on Saturday. Every third week he gets a weekend off, but has to work a half a day, apparently on Saturday. The court asked who he would "be counting on to take care of Gerald and act as a mother to the child if he were to have him." Appellee replied: "Ruth [his sister] would help me. I have an aunt that I probably will live with, both of my sons. I have already discussed it with her. I would like to keep my house, but I might not be able. I lived twenty

ter and something I want to take more time to decide. For that reason I will not make a decision on the custody this afternoon."

years with my aunt and I can go over there and my sons can go over there." The court inquired: "Well, Bob, with this situation with Mrs. Beam, regardless of whether anything wrong is happening you of course haven't seen anything wrong happening with Gene Loomis. You have your thoughts about it, but you haven't seen anything. As far as Jerry is concerned, isn't it six of one and half a dozen of the other, both of you seeing somebody else?" Appellee asserted that he "don't bother with anybody" and that Mrs. Beam was a "very nice lady and a respectable lady." On the other hand he claimed that appellant had been fooling with a married man for three years. "All she deserves is Mr. Loomis and her freedom to go to the Bowling Alley or the back roads or whatever." After 24 February 1970 he thought he was divorced. The court adduced additional information about the aunt. She was 72 years old and took care of the older boy. She and appellee's sister or his sister-in-law would take care of Gerald during the day and in the evening when appellee worked his sister would take care of the child.

Mrs. Allan Eugene Loomis, Sr. testified that she was living with her husband and that he had never asked for a divorce although one time he suggested that perhaps they "should have a separation". She was away for two months, 11 April to 4 June, after the trial of the instant action and had "no knowledge what went on at that time." But on 4 June she saw his car near appellant's house at 12:00 A.M. and he got home an hour later. She kept a log. On five other occasions to 13 June she saw his car by Mrs. Widdoes' house and he arrived home an hour or so later. On 13 June, seeing his car, she went straight to the window of the house and looked in "and there were no lights in the apartment." It appeared on cross-examination that she had not seen her husband on any of the occasions she saw the car but when he got home at 1:30 or 1:45 or 2:00 o'clock in the morning and she asked him, "You don't mean to tell me that you are

spending seven nights a week there?", he said, "Could be."

Appellant testified in her own behalf. She had custody of Gerald since the trial on 24 February. As agreed she left him with appellee every Sunday after Sunday School and picked him up at 8:00 P.M. that night. He had not asked for the child at any other times and had he requested additional right of visitation she would have granted it. She claimed that appellee was behind about 16 weeks in the child support payments because although he was to pay four and sometimes five times a month he actually paid only three times a month. She had been receiving about $60 a month instead of $20 a week. She said her relationship with Gerald was "the best." She worked at the Elkton Trucking Company and her niece, Terry McDaniel, 17 years of age, who lives in Newark, Delaware, took care of him during the day. She left him with Terry every morning and picked him up every afternoon "straight from work at 4:30," and this pattern was followed regularly except for one week when her niece was away. During that period the child stayed during the day at the home of Curtis George. After 4:30 P.M. appellant took care of the child. "He had never been out of my sight. He has been out of my sight for one night since February 24th. We go to Little League Ball Park three or four nights a week down in back of Newberry's and I go with him." When she picks up the child on Sunday from his father "I get a going over, a tongue lashing every Sunday." In front of the boy "[h]e tells me like, you have no reason having this boy—Jerry, your mother is shacking up with a married man—all that kind of stuff." Gerald told her that appellee had been taking him to Mrs. Beam's house and she checked. She said his car was there every night in the week. "All different hours. I would say anywhere from 9:30, ten o'clock, eleven o'clock, twelve o'clock, one o'clock, two o'clock and as high as 3:00 A.M. in the morning." Her testimony indicated that Mrs. Beam on some occasions had been in the house

owned by appellant and appellee. She said she had been in the company of Loomis since 24 February and that her son was present. He took her and Jerry out to dinner at Gino's on 13 May "which was the first occasion I had seen Mr. Loomis since February 24th." They got home at 10:15 P.M. and Loomis let her and Jerry out in front of the apartment and he continued on home. "He did not come in the apartment." Once they also went to an Oriole game and Loomis took her and Jerry to the airport when she went to her sister's on vacation and picked her up when she returned. "When he came back I wouldn't even let him take the luggage into the house, he set the luggage on the sidewalk and I carried it in." Loomis had been in her apartment three times since February 24th —on a Saturday afternoon when Jerry had the mumps because she was working and on two evenings. She explained that there was another car exactly like his that parks in the parking lot.

At the close of all the evidence the court said:

> "I am going to decide the case, now. I am sure that it will not be a perfect decision because you can't make perfect decisions in situations like this. I am certain that both parties are not blameless. We have to decide the case on what is in the best interest of the child and everything else must yield.

> As I said last February the Court will sign a decree divorcing the husband from the wife on grounds of adultery. This being bottomed on the inclination and the opportunity to commit the act. Last February the evidence was scant as to any visitation by the alleged paramour. I think there being only one instance that a detective; or maybe two instances that the detective was able to satisfy himself that there was actual visiting between the two. The Court finds that as a fact now, that visitation on a more

regular basis and it isn't denied except in part. The Court believes Mrs. Loomis when she made these notes and made these visits and went up to the car to see that it was her car and that there was no mistake. So, that establishes at least when she checked in June of 1970 a rather regular period of seeing each other four or five times in one week at least.

Now, the law in this situation is that first of all of course the child eight years old belongs with the mother. The next rule of law is that while the child belongs with his mother where there is an adulterous situation normally it is not in the best interest of the child that he go with such mother. Of course, these principles of law were obvious to the Court last February when this case was heard but there were a number of factors in the case on both sides that caused the Court to take the matter sub-curia. For example, the young son was an honor student at Tome School while in his mother's custody; his mother took him to Sunday School; there was a pretty good period of visitation as far as the father seeing the child every Sunday; a babysitter was provided when the mother wasn't there and she was well able to care for the child financially. Even the father said that he wasn't sure and didn't know whether the mother was a fit custodian—he did not say that she was not a fit custodian. So, with those facts the Court took the matter sub-curia and held it sub-curia without any decision hoping that the matter would resolve itself. Unfortunately the matter has not resolved itself and things haven't improved. Therefore, the Court has reached a conclusion that it is going to invoke these principles of law that apply in the usual case and rightly or wrongly the Court is going to for the

time being award the custody of this child to the father. I want to hasten to add that the father should not consider this a victory in any sense. We are going to see how it works. I would admonish both parents that this fighting, physical combat and abuse from either one side or the other really doesn't help the one who is doing it at all. Unfortunately here we have parents who are in the same town with just a few blocks from each other so that there can be a visitation with the mother. I expect that there will be visitation with the mother. I would like, subject to the attorneys working out some better arrangement that may appeal to the parents on a mutual basis—I would like the visitation to continue each Sunday with the mother as much as it has with the father in the past. I would like that incorporated in the decree. As far as other rights of visitation, they should be reasonable. They shouldn't be denied and if they are denied it will jeopardize the position of the custodian, because you must remember that you're both still parents and that generally speaking there isn't anything gained by running down, so to speak, the other parent in the eyes of the child.

There is probably more that I should say but I am going to let it rest there, * * *."

Appellee argues that the decision of the lower court must be affirmed unless it was clearly erroneous. Maryland Rule 1086. In our review the clearly erroneous rule applies to the chancellor's factual findings. But for the reasons set out in *Sullivan v. Auslaender*, 12 Md. App. 1, we must exercise our best judgment in determining whether the conclusion as to custody the chancellor reached on those facts was the best one, best, that is, for the welfare, benefit and interest of the child.

From the remarks of the chancellor in reaching his conclusion, he did not expressly find appellee to be a fit custodian. And we feel that if he had not found that appellant and Loomis had a "regular period of seeing each other four or five times in one week at least" subsequent to the trial at which he had announced he was awarding appellee a divorce, custody would have remained in appellant.[2] Apart from appellant's association with Loomis it does not appear that the chancellor considered her unfit to have custody of the child. On the contrary it was noted that the boy had been an honor student while in appellant's custody; that she took him to Sunday School; that a baby-sitter was provided when she was not with him; that she was well able to take care of the child financially; and that even appellee had not said that she was not a fit custodian.[3] It is patent that the fact that the older boy was in the custody of the father had no bearing on the decision as to the younger boy and in view of the difference in the ages of the two boys and the overall situation—the older boy had in effect grown up—we do not think it was of any real relevance. Compare *Hild v. Hild*, 221 Md. 349, 359. But the fact remains that the chancellor granted a divorce to appellee because it found appellant to be an adulteress and this judgment was not challenged on appeal. Nor can we say that the chancellor was clearly wrong in finding on the evidence adduced at the hearing that an adulterous situation existed with

2. We so feel in the light of the chancellor's comment that he held the custody award sub-curia hoping the matter would resolve itself and his finding that "the matter has not resolved itself and things haven't improved." We can only construe this to mean that appellant and Loomis were seeing each other in circumstances providing the opportunity to commit adultery.

3. At the original trial some seven witnesses testified in substance that appellant was a fit and proper person to care for the boy. There was also evidence that she had been employed for 25 years by the Elkton Trucking Company, that a home was purchased at a time when appellee was not working—it seemed that he required psychiatric help, was treated by 18 different doctors between 1958 to 1967 and was not employed in 1959, 1960, 1961 and worked only a short time in 1962. Appellant arranged for the mortgage loan and made the mortgage payments.

respect to appellant and Loomis after the case was first heard. So we accept the chancellor's factual findings. And we do not find his statements of the applicable law to be incorrect. The rules of law relating to custody were well stated in *Palmer v. Palmer,* 238 Md. 327 at 331:

"The overriding consideration in determining to whom the custody of a child should be awarded is, we have consistently held, the best interest and welfare of the child. * * * A correlative rule is if the mother is a fit and proper person to have custody and other things are equal, she is usually awarded the custody of children of tender years. * * * Where the mother is not a fit and proper person, custody is awarded to the father, provided he meets the test of being fit and proper, and, if not, to some other person. If the mother is shown to be an adulteress, a strong presumption arises that she is not a fit and proper person to have custody. To overcome this presumption, a strong showing must be made of facts and circumstances which indicate that the mother is, in fact, nevertheless fit and proper. Such rules are not to punish a wayward parent nor reward a virtuous one. They are based upon the presumption that adultery is a highly persuasive indicium that the guilty party does not meet the test, when a choice must be made between parents, of which is the better suited to bear responsibilities of rearing the minor child. * * *

The rule is not absolute. When the adulterous relationship has ceased and appears unlikely to be revived because the mother has changed her way of living, her past indiscretions may be overlooked and she may be given the custody of a minor child. * * * However, the past decisions of this Court require a strong showing to

be made to overcome the usual rule against awarding custody to an adulterous mother. The fact that she subsequently marries her paramour has not been regarded as meeting the requirements of such a showing.* * *."

We see no variance with these rules in the chancellor's statement that "* * * where there is an adulterous situation normally it is not in the best interest of the child that he go with such mother." We find no real departure in opinions of the Court of Appeals after *Palmer* from the necessity that a "strong" or "clear showing" be made to overcome the usual rule against awarding custody to an adulterous mother and that such showing cannot be made unless the adulterous relationship has ceased and appears unlikely to be revived because the mother has changed her way of living. Compare dissenting opinion of Barnes, J. in *Neuwiller v. Neuwiller*, 257 Md. 285, 287-291. Appellant quotes from the majority opinion in *Neuwiller* in arguing that the custody of a young child may be given to an adulterous mother. The Court observed that recent Maryland cases clearly supported the chancellor's position that the adulterous conduct of the mother "* * * was not determinative of the central issue which in any custody case is who will further the best interests of the child", citing *Kauten v. Kauten*, 257 Md. 10; *Orndoff v. Orndoff*, 252 Md. 519; and *Cornwell v. Cornwell*, 244 Md. 674. But appellant omits from the quotation the statement immediately following:

"Although the evidence is not as clear as the Court should like to see it that the mother had definitely ceased her relationship with the paramour, yet, Judge Maguire [the chancellor below] did note that she had not associated with him for the past few months." 257 Md. at 286.

In *Kauten*, as Judge Barnes said in his dissent, the Court "* * * clearly indicated that the adulterous mother had

repented of her past misconduct, had experienced a religious conversion and was leading an exemplary and upright life at the time of the custody hearing." 257 Md. at 289. In *Orndoff* it seemed that the evidence of adulterous conduct was "conflicting and unpersuasive" so that the lower court was not clearly erroneous in finding that the alleged misconduct had not been established. And in *Cornwell* the lower court found that the adulterous mother had repented of her adulterous conduct and offered a stable home where the children would be well cared for and happy. In *Miller v. Miller*, 245 Md. 711, the lower court, in granting custody to an adulterous mother, found "a true repentance of the illicit relationship" and that she was otherwise fit. So it is clear that there is no absolute rule that one who has committed adultery is *ipso facto* an unfit person. But it seems that the Court of Appeals has not approved the grant of or granted custody of a child to a mother who continued her adulterous conduct. But in *Orndoff* there is an interesting statement. In that case the father, seeking custody of a child, the custody of whom had previously been awarded to the mother, attempted to show that the mother had continued an illicit relationship with one who had been named as her paramour when a divorce had been obtained on the grounds of adultery. As above stated the evidence was not sufficient to establish this allegation, but the Court concluded its opinion by saying:

> "Even if the appellant had established illicit conduct on the appellee's part, we cannot say under the circumstances presented in this case that the lower court erred in dismissing appellant's petition." 252 Md. at 522.

While this dictum could be deemed an indication that the rigors of the established rule may be relaxed by the Court of Appeals in some future case, it has not as yet been applied; we feel obliged to follow the established rule. We find that appellant did not make a clear showing re-

butting the presumption that she is an unfit person to have custody of Gerald at the time the custody order was passed by the lower court.

However, we are not satisfied that the conclusion of the chancellor was the best one. Attempting to exercise our independent judgment we are frustrated by the record. It may be, as appellee suggests in his brief, that the chancellor knew more about the situation of the parties than the record discloses, but, if so, such knowledge is not before us. We find very uncertain who is actually to care for and supervise the child when appellee is at work during the day, at night and on such weekends when the father is working and the mother is not exercising her right of visitation. Is the child to be in the care of appellee's sister, his sister-in-law, or his 72 year old aunt? And is he to be in the home of the one caring for him? If so, what kind of environment does it provide? When inquiry was made by the court it appeared that appellee's plans concerning the child were nebulous at best. We are unable to determine on the record before us what is in the best interest, benefit and welfare of Gerald.

We affirm that portion of the decree of 17 August 1970 ordering and decreeing that appellee be divorced a vinculo matrimonii from appellant and that portion of the decree ordering that the custody of Charles Carson Widdoes be awarded to appellee. That portion of the decree ordering that the custody of Gerald Kevin Widdoes be awarded to appellee is remanded without reversal or affirmance for a plenary hearing in which the chancellor, in making his determination as to where the best interests of the child lie, should cause the production of such testimony and other evidence, including such investigations and reports of qualified social agencies concerning the living conditions and environment of the home in which the child will actually reside as well as be placed while appellee is at work, as may be necessary for a fair hearing. And the chancellor may deem it advisable at such hearing to cause the production of evidence relating

to whether appellant has now repented of her adulterous conduct and would most likely in the future live an upright and proper life in which the child would have a good moral environment and proper home life. If upon such hearing the chancellor determines it to be best that appellant or some third person be awarded custody of the child, he shall order such provisions for support and visitation as may be proper.

> *Decree affirmed in part and in part neither affirmed nor reversed and cause remanded for further proceedings in accordance with this opinion; costs to be paid by appellee.*