### FRANCES TERESA SARTOPH *v.*
### LEE IRVIN SARTOPH

[No. 751, September Term, 1975.]

*Decided March 31, 1976.*

The cause was argued before MOYLAN, DAVIDSON and MELVIN, JJ.

*Michael I. Gordon,* with whom were *Smullian & Gordon* on the brief, for appellant.

*Morton Edelstein,* with whom were *Lawrence M. Stahl* and *Edelstein & Getlan* on the brief, for appellee.

DAVIDSON, J., delivered the opinion of the Court.

On 19 September 1965, the appellant, Frances Teresa Sartoph (mother), married the appellee, Lee Irvin Sartoph (father). One child, Ronald Tobias Sartoph, was born of this marriage on 1 March 1966. On 28 August 1969, the parties voluntarily separated and in a separation agreement dated 30 September 1969, agreed that the mother should have custody of the child. On 16 April 1971, in the Circuit Court No. 2 of Baltimore City, the father was awarded an absolute divorce on the ground of a voluntary separation. The decree, in pertinent part, incorporated the 30 September 1969 separation agreement, and awarded custody of Ronald to the mother.

In 1969, while the parties were separated, but before they were divorced, the father met and started dating his present wife, Teresa Gail Sartoph, whom he married in June, 1971. A child, Mordechai, was born to them in 1974.

In October, 1971, the mother met James Robinson. A sexual relationship developed. In October, 1972, the mother and Ronald moved into Robinson's one bedroom apartment. In November, 1972, the mother married Robinson. In January, 1973, they separated. In August, 1974, the mother obtained a divorce from Robinson on the ground of a voluntary separation.

In June, 1973, the mother, separated but not yet divorced from Robinson, met Dante Gentlilucci (lover), a married man with three children. A sexual relationship developed. Occasionally, they engaged in sexual intercourse in the mother's home, in which Ronald was residing.

On 21 January 1974, the father filed a petition in the Circuit Court No. 2 of Baltimore City, alleging that the mother was not a fit and proper person to have custody of Ronald and seeking custody of the child for himself. On 28 January 1974, the mother filed an answer and a petition for modification of the decree as to child support.

Thereafter, the mother prohibited her lover from coming to her apartment although she continued to meet him on occasion outside her home. On no occasion, however, did she stay away from her apartment overnight. Ultimately, the lover separated from his wife and became engaged to the mother.

After a hearing on the father's custody petition, held on 12 May 1975, the chancellor said in pertinent part:

"I have . . . sized up the former Mrs. Sartoph. I have considered her relationship with Mr. Gentlilucci and dating him, although she knew he was a married man, and having sexual relations, *and that she is still seeing him, and I give that a great deal of weight.* I think it is significant . . . [that] from the time . . . the petition [for change of custody] was filed . . . suddenly her relationship changed . . . . What I am really saying is, I think what the Courts are saying, and not so much what the child sees and what the child knows, that when a person commits adultery, it is a serious violation of the sacred state of marriage, and that reflects on the moral character of the person in such a strong way in our law that it has a very strong and significant bearing on what is in the best interest of the child in terms of the moral climate. The Courts talk about a clean and wholesome atmosphere and maintaining the rules of proper social conduct, and even though, as Mr. Gordon has been arguing, that the wife is entitled to live her life, I certainly find that what the Court is saying, and I am bound by what the Court of Appeals is saying, that in spite of what may be sophisticated and outward logic on this matter is concerned, we still look in terms of a wholesome atmosphere, devotion man to wife, and even though we are more and more, day by day, and month by month accepting people who live together without the benefit of clergy, and we don't frown as much as we used to do at the birth of illegitimate children, still I think basically our

society's logic is the idea of a clean and wholesome atmosphere and a clean and moral conduct.

"I am also mindful of the fact the Court of Appeals has held in the *Hild* case that there is a presumption that a person who commits adultery is . . . an unfit parent for a child, and . . . they require a strong showing to overcome that." (Emphasis added.)

Finding the father to be a fit and proper person to have custody of Ronald, the chancellor indicated that he would award custody to the father.

On 29 May 1975, the mother moved for a rehearing, averring that in order to avoid trauma, Ronald had not been called to testify at the first hearing, but that upon being told of the chancellor's decision, he had become hysterical, and wanted an opportunity to tell the judge that he objected to a change in his custody. The motion was granted and on 16 July 1975 a further hearing was held.

Ronald testified that, while both his parents loved him and had nice homes, he would rather stay with his mother than his father "because it seems like there's more kids my age at my mother's, and I can go to school and everything, and everything is real close, and I could walk to it." Mrs. Sartoph testified that after the 12 May 1975 hearing she terminated her relationship with her lover and did not intend to see him again because "my son is more important to me."

At the conclusion of that hearing, the chancellor said:

"I'm pretty convinced in this case that I made the right finding, even though it is not finalized in a decree. I remember this case very vividly, and I have had some feeling in the last two years in these cases that perhaps the Court of Appeals decisions have not caught up, even if that's a wise thing to do, with the modern concepts that people are accepting. People are living together now without benefit of marriage, and living openly, and it's above-

board and in the best circles it's being accepted as a common sense approach; however, I still think that the majority of the people in this country are opposed to that style of living, and then one judge or another might have a difference with respect to whether it's moral or whether it's a sensible thing to do. I feel in this case as I do, that I have to follow the dictates of a higher court, and I have used those decisions in this case as well as others.

"I'm convinced that as the law now stands, if a wife is guilty of a serious misconduct, or a husband, and the Courts do consider living together without benefit of marriage misconduct, and still do. That's a very significant factor for the Court to consider. There have, and as I said before, when I was practicing law, if you prove the wife committed adultery on one night, she lost custody of the children. I think that's absurd, and we have come away from that concept.

"However, the Court of Appeals has said that if the wife recognizes her misconduct and the Court is satisfied that she understands it was wrong and the relationship has ended, then you would give either party custody of the child, and I keep saying wife, but also applies to the father.

"In this particular case I didn't award the custody to the mother, because the wife was guilty of an act of adultery, because in this case we had, as I reviewed my notes, Ms. Sartoph's style of living which has been consistently incompatible with our standards of morality as the Court of Appeals has announced, because in her relationship with Mr. Robinson, and it was an adulterous relationship, and the child was involved in that, and one other man whose name escapes me, the child was involved in that, and Mr. Gentlilucci was a married man with three children. He was seeing her while he was married, and finally left his wife.

"All of that is not just a question of 'committing adultery.' This is a consistent pattern of conduct which has not been accepted. I don't want to call it immoral because there are views on that, but as far as the Court of Appeals is concerned, that is not the kind of conduct that our courts have accepted.

"In view of that, even if I found that the relationship has ended and I have some feeling about that, it would not in my opinion, change our finding, . . . Mr. Sartoph impressed me as a very sincere and committed father to this child, and I make that a very significant part of my finding.

"I would also have to say that after talking with Ronnie in chambers, a very bright kid, and very understanding kid, he convinced me that he's happy with his father, even though I recognize he would prefer to stay with his mother, but the reason for that does not seem to be at all significant.

"So, looking at the totality of the evidence, I am convinced that the best interest of this child would be served by having the custody awarded to the father, and I'm asking that the decree be drawn up that way. . . ."

On 17 July 1975, the chancellor entered an order awarding custody of Ronald to the father, and providing a detailed schedule of visitation rights for the mother, to which both parties agreed. It is from that order that this appeal is taken.

The sole question on appeal is whether the court erred in transferring custody of Ronald, then age nine, to the father. The mother primarily contends that the trial court's finding that she was an unfit and improper person to be awarded custody of the child was clearly erroneous. She maintains that her son had been with her all of his life and that she has always cared for him properly. She points out that her uncontradicted testimony shows that after January, 1974, her illicit relationship with her lover was confined to meetings away from her home, so that it was totally hidden

from her son, and that after 12 May 1975, the illicit relationship was terminated. She argues that this evidence was sufficient to overcome the presumption of unfitness which arose from her previous illicit behavior. She concludes that under the circumstances there was no justification for a change in the child's satisfactory and successful environment.

In custody cases we have repeatedly limited the applicability of the "clearly erroneous" rule to the factual findings underlying the chancellor's conclusions as to what constitutes the best interests and welfare of the child, reserving the right to exercise our own best judgment as to the appropriateness of that conclusion.[1] Under the facts of this case, we have determined that the chancellor's implicit finding that the mother was unfit to have custody of the child was clearly erroneous.

An adulterous parent is presumed to be unfit.[2] The presumption is rebuttable and, when rebutted, custody may be awarded to the transgressing party.[3] The presumption of unfitness is overcome by a showing that the adulterous party has repented, has terminated the adulterous relationship, and has changed his or her errant ways so that there is little likelihood of a recurrence of past indiscreet behavior.[4] Indeed, this Court has recognized that the presumption is overcome, even where an otherwise fit mother is required by decree to terminate her association

1. Barsallo v. Barsallo, 18 Md. App. 560, 565, 308 A. 2d.457, 460 (1973); Mullinix v. Mullinix, 12 Md. App. 402, 412, 278 A. 2d 674, 680 (1971); Sullivan v. Auslaender, 12 Md. App. 1, 3-5, 276 A. 2d 698, 700-01 (1971).

2. Palmer v. Palmer, 238 Md. 327, 331, 207 A. 2d 481, 483 (1965); Hild v. Hild, 221 Md. 349, 358, 157 A. 2d 442, 447 (1960); Pangle v. Pangle, 134 Md. 166, 170, 106 A. 337, 338 (1919); Widdoes v. Widdoes, 12 Md. App. 225, 235, 278 A. 2d 100, 105 (1971); see Pontorno v. Pontorno, 257 Md. 576, 580-81, 263 A. 2d 820, 822 (1970).

3. Neuwiller v. Neuwiller, 257 Md. 285, 286, 262 A. 2d 736, 737 (1970); Kauten v. Kauten, 257 Md. 10, 12-13, 261 A. 2d 759, 761 (1970); Cornwell v. Cornwell, 244 Md. 674, 679, 224 A. 2d 870, 873 (1966); Mullinix, supra, 12 Md. App. at 411, 278 A. 2d at 679; see Orndoff v. Orndoff, 252 Md. 519, 522, 250 A. 2d 627, 628 (1969).

4. Kauten, supra, 257 Md. at 12-13, 261 A. 2d at 761; Hild, supra, 221 Md. at 358, 157 A. 2d at 447; Oliver v. Oliver, 217 Md. 222, 228-30, 140 A. 2d 908, 910-12 (1958); Trudeau v. Trudeau, 204 Md. 214, 221-22, 103 A. 2d 563, 566 (1954); Widdoes, supra, 12 Md. App. at 235-36, 278 A. 2d at 105.

with her lover, as a condition of keeping her children in the future. In so doing, we acknowledged that an otherwise fit mother who understands full well that she must give up her lover in order to keep her child, and terminates her illicit relationship, has sufficiently repented and changed her errant ways. Her knowledge that a repetition of her past indiscretions will result in the loss of her child makes a recurrence highly unlikely. Thus, the presumption of her unfitness is overcome.[5]

Here, the record clearly establishes that the mother had engaged in at least one illicit sexual relationship. The presumption of unfitness arose.[6] There was, however, uncontradicted evidence to show that when, in May, 1975, the mother finally understood that she must give up her lover in order to keep her child, she voluntarily terminated her illicit relationship. This evidence clearly established not only that she had repented and changed her errant ways, but also that a recurrence of her past indiscretions was unlikely.

Moreover, there was much evidence to show that in all other respects the mother was a fit and proper person to have custody of the child. The general surroundings in which the child lived were pleasant. There was a loving relationship between the child and his mother. He was happy, healthy, well-adjusted and emotionally stable. He was doing well not only at home but also at school, where he achieved academically and was accepted by his peers. He was successfully studying Hebrew and piano and participated in Little League Baseball. His mother was integrally involved in all of his activities.

---

5. Mullinix, *supra*, 12 Md. App. at 411, 278 A. 2d at 679.

6. We recognize that in Maryland, fornication, that is, sexual relations between two unmarried persons, is not a crime, so that participation in such a relationship may not constitute illicit conduct. Whether before their marriage, the divorced mother's relations with Robinson, a single man, constituted illicit conduct, raising a presumption of unfitness, need not be decided here because ultimately the divorced mother engaged in a sexual relationship with Gentlilucci, a married man. In Shanbarker v. Dalton, 251 Md. 252, 257 A. 2d 278, 281 (1968), the Court of Appeals held that "[r]egardless of legal hair-splitting on the definition of adultery," the presumption of unfitness arises when a divorced mother has a sexual relationship with a married man.

In a letter dated 9 January 1975, Ronald's pediatrician stated that the child "was examined today and found to be in good physical and emotional health." In a letter dated 29 January 1975, Ronald's Hebrew teacher stated that he "is very bright and clearly enjoys his studies," "shows enthusiasm for his other activities," and "seems to get along well with his peers." In a letter dated 12 January 1975, Ronald's third grade teacher stated that he did third grade level math and reading, participated in group discussions, played with other children, and initiated conversations with the teacher. Ronald's school report card for the first semester demonstrated a high level of performance.

Ronald himself said he preferred to live with his mother. Moreover, the father conceded that Ronald was not living in a "bad environment" at the time of the 12 May 1975 hearing.

In our view, the chancellor erroneously failed to consider that in May, 1975, the mother, in order to avoid the loss of her son, terminated her relationship with her lover, who by then was separated from his wife, and to whom she was by then engaged. The absence of any evidence to show that after 12 May 1975 the mother continued to engage in an illicit relationship, or that her previous indiscreet behavior had had any adverse effect on her child, coupled with the abundant evidence that in all other respects the mother was a fit and proper person to have custody of the child, constitutes a "strong showing" rebutting the presumption of the mother's unfitness. Consequently, the evidence failed to support the chancellor's implicit finding that the mother was unfit.

Accepting the chancellor's finding that the father was a fit and proper custodian of the child, the question now before us is whether, in our best judgment, the chancellor's award, which transferred Ronald's custody from the mother to the father, serves Ronald's best interests.

The custody of children should not be disturbed unless there is some strong reason affecting the welfare of the child.[7] To justify a change in custody, a change in conditions

---

7. Krebs v. Krebs, 255 Md. 264, 266-67, 257 A. 2d 428, 429 (1969); Kramer v. Kramer, 26 Md. App. 620, 623, 339 A. 2d 328, 331 (1975); Sullivan, *supra*, 12 Md. App. at 5, 276 A. 2d at 701.

must have occurred which affects the welfare of the child and not of the parents.[8] The reason for this rule is that the stability provided by the continuation of a successful relationship with a parent who has been in day to day contact with a child generally far outweighs any alleged advantage which might accrue to the child as a result of a custodial change.[9] In short, when all goes well with children, stability, not change, is in their best interests.

Here, the record shows that Ronald has been in the care and custody of his mother his whole life. Since the separation of the mother and father, during the school year he has spent weekdays with the mother and alternate weekends with the father. He spent the last summer with the father, and planned to spend the next summer with him as well. Under this arrangement, Ronald has grown into a healthy, emotionally well-adjusted child, who is doing well at home and at school.

In the absence of any evidence that the mother is presently unfit to care for this child, or that the child is experiencing any kind of difficulty, there is nothing in this record which justifies a change in custody. The stability to be provided by a continuation of the child's present relationship with his mother in his successful living environment far outweighs any alleged advantage which might accrue to him as a result of a custodial change.

On the basis of the record before us, we are persuaded that an award changing custody from the mother to the father is not in the best interests of Ronald. Accordingly, the decree awarding custody of Ronald to the father will be reversed. The case will be remanded to the trial court for the purpose of determining whether child support should be

8. Hardisty v. Salerno, 255 Md. 436, 438, 258 A. 2d 209, 210 (1969); Winter v. Crowley, 231 Md. 323, 331, 190 A. 2d 87, 91 (1963); Kramer, *supra*, 26 Md. App. at 623, 339 A. 2d at 331; Peterman v. Peterman, 14 Md. App. 310, 320-21, 286 A. 2d 812, 819 (1972); Sullivan, *supra*, 12 Md. App. at 5, 276 A. 2d at 701.

9. J. Goldstein, A. Freud, & A. Solnit, *Beyond the Best Interests of the Child* (1973).

increased, as well as the extent of the father's visitation rights.

*Decree reversed.*
*Case remanded for further pro-*
*ceedings in accordance with*
*this opinion.*
*Costs to be paid by appellee.*