# BRIAN B. CHRISTMAN, JR. *v.* LORRAINE ROSE FARINICK O'CONNOR

[No. 1084, September Term, 1976.]

*Decided May 20, 1977.*

The cause was argued before THOMPSON, DAVIDSON and MOORE, JJ.

*William T. Glasgow* and *Thomas A. Garland* for appellant-cross-appellee.

*William H. Morstein,* with whom was *Nelson R. Kerr, Jr.* on the brief, for appellee-cross-appellant.

THOMPSON, J., delivered the opinion of the Court.

In this child custody dispute we refuse to be cast in the role of a "Monday Morning Quarterback" by substituting our judgment for the chancellor's.[1] We shall affirm the decree. When this case was last before us, the chancellor had awarded the custody of the only child of the parties, an eight year old boy, to the mother, and the father had appealed. After remand by this Court, the custody was again awarded to the mother, by the Circuit Court for Howard County, and the father appeals.[2]

In our prior unreported opinion we recited the facts as follows:

"On 31 December 1966, the appellant, Brian B. Christman, Jr. (father), then about age 21, married the appellee, Lorraine Rose Farinick [Christman] O'Connor (mother), then about age 18. One child was born of this marriage, Brian Burdell Christman III, on 6 July 1967. By July, 1969, marital difficulties had become significant and the parties separated. After several weeks the mother advised the father that she had had an affair with a college student and was pregnant. The father returned, and, upon the advice of the Catholic Charities, took her to Puerto Rico where she had an abortion. Thereafter, in September, 1969, the parties became reconciled and moved to Gettysburg, Pennsylvania. This reconciliation did not last long. In October, 1970, the parties separated. In September, 1970, the mother met James F. O'Connor, Jr. (lover), then age 23, who was then married to Janice Paige Cochran Melfa O'Connor, the woman he had wed on 9 March 1968. On 1 June 1971, though they were each married, the mother and her lover, who had previously engaged in sexual relations but had lived separate and apart, began to live together. Having 'chosen not to be legally married,' they simply said vows to one another and then held themselves out as husband and wife. Brian Christman III lived with them and was treated as their son.

"On 15 October 1971, the father, still living in Pennsylvania, obtained a decree of divorce from the mother

---

1. *See* Davis v. Davis, 280 Md. 119, 372 A. 2d 231 (1977).
2. Two different chancellors have awarded custody to the mother.

on the ground of 'indignities.' The father did not seek custody and the Pennsylvania court made no award of custody because that court lacked jurisdiction over the child who was then residing with the mother and her lover in another state. On 11 May 1972, the lover became divorced from his wife. In June, 1972, the couple produced a female child, Kelley Arden O'Connor.

"From October, 1970, when the parties finally separated, until the present, the father has lived in Pennsylvania. From the time of the separation in October, 1970, until 1 June 1971, the mother and young Brian lived with her parents in New Jersey. Between 1 June 1971 and March, 1972, they lived with her lover in New Jersey. From there all three moved to Delaware where they and the newly born daughter lived together until 1 February 1973, when they all moved to a home in Columbia, Maryland. Throughout this period of time the father, who was voluntarily paying $80 per month for child support, saw his son on approximately a dozen occasions.

"On 30 March 1973, the father filed a petition in the Circuit Court for Howard County alleging that the mother was not a fit and proper person to have custody of Brian Burdell Christman III and seeking custody of the child for himself. On 18 April 1973, the mother filed an answer denying that she was unfit and seeking permanent custody for herself. On 22 June 1973, after a hearing, Judge Mayfield entered an order granting visiting rights to the father. In another order, entered the same day, Judge Mayfield ordered the Department of Social Services to conduct an investigation into the life and living conditions of the child and to report the results of that investigation to the court. On 30 August 1974, after hearings, the chancellor entered an order granting custody of young Brian to his mother."

In that case, we discussed the law as follows:

"In custody cases we have repeatedly limited the applicability of the 'clearly erroneous' rule to the factual findings underlying the chancellor's conclusions as to what constitutes the best interest

and welfare of the child, reserving the right to exercise our own best judgment as to the appropriateness of that conclusion. *Barsallo v. Barsallo*, 18 Md. App. 560, 565 (1973); *Mullinix v. Mullinix*, 12 Md. App. 402, 412 (1971); *Sullivan v. Auslaender*, 12 Md. App. 1, 4-5 (1971). Under the facts of this case we have determined that the chancellor was clearly erroneous in arriving at his conclusion that the mother was a fit and proper person to have custody of the child.

"In Maryland there is a presumption of unfitness on the part of an adulterous party. *Palmer v. Palmer*, 238 Md. 327, 331 (1965); *Hild v. Hild*, 221 Md. 349, 358 (1960); *Pangle v. Pangle*, 134 Md. 166, 170 (1919); *Widdoes v. Widdoes*, 12 Md. App. 225, 237-38 (1971); *see Pontorno v. Pontorno*, 257 Md. 576, 580-81 (1970). The presumption is rebuttable and, when rebutted, custody may be awarded to the transgressing party. *Neuwiller v. Neuwiller*, 257 Md. 285, 286 (1970); *Kauten v. Kauten*, 257 Md. 10, 12-13 (1970); *Orndoff v. Orndoff*, 252 Md. 519, 522 (1969); *Cornwell v. Cornwell*, 244 Md. 674, 679 (1966); *Mullinix, supra*, at 12 Md. App. 411. The presumption of unfitness is overcome by a showing that the adulterous party has repented, has terminated the adulterous relationship, and has changed his or her errant ways so that there is little likelihood of a recurrence of past indiscreet behavior. *Kauten, supra*, at 257 Md. 12-13; *Hild, supra*, at 221 Md. 358; *Oliver v. Oliver*, 217 Md. 222, 228-30 (1958); *Trudeau v. Trudeau*, 204 Md. 214, 221-22 (1954); *Mullinix, supra*, at 12 Md. App. 411-12; [1] *Widdoes, supra*, at 12 Md. App. 235-36. *While changing social values might require a change in the public policy of the State of Maryland with respect to the fitness of an adulterous mother as the custodian of a child, the Court of Appeals has not departed from this rule, and we must apply the*

*law as it is laid down. Widdoes, supra,* at 12 Md. App. 236." (Emphasis added).

"1. While it is true that in Mullinix custody was awarded to the mother, who was continuing her relationship with her lover, it was done so only on condition that such indiscretion cease immediately and because of overwhelming evidence of her fitness."

Applying those principles to the case, we determined that we were unable to tell from the record what would be in the best interest of the child and remanded the case. The chancellor was directed to determine whether the mother had now repented her illicit conduct and would most likely in the future live an upright and proper life in which the child would have a good moral environment and home life. Additionally, he was directed to keep in mind the rules that while marriage to the former lover is not in and of itself sufficient to show that the person engaged in adulterous or illicit sexual relations is a fit and proper person to raise a child, it is a factor which may be considered in determining fitness, as well as the mother's attitude towards her past misconduct.

After remand, Judge James Macgill redetermined that the best interest of the child would be to give custody to the mother. He summarized the testimony and the investigations by the social services agencies that had been requested by the trial judge, and found as follows:

"The principal rule by which this Court is to be guided in deciding the issue of custody is that the foremost consideration is the best interests of the child. This Court is not entirely happy with some aspects of Mrs. O'Connor's character, since it believes that she was less than frank in not making it known that she and her husband were planning to move to Frederick. This fact was of some importance in view of Brian's testimony that he wanted to remain where he was because of his association with his friends and his interest in the soccer team of which he was a member. This Court also does not believe for a moment that Mr. Kane advised Mrs. O'Connor that Maryland recognizes

common law marriages.[3] On the other hand, it appears that Mr. Christman's plans for his own future are uncertain. It has been mentioned that at the earlier hearing before Judge Mayfield he had expressed his intention to marry one woman and at the time of the hearing before this Court he expressed his intention to marry another one, even though he had not yet proposed to her. If Brian were removed from his present home and placed in the custody of his father he would be required to make a considerable adjustment. For part of the time he would be in the care of a couple in York who operates a day care center and he might also have to accustom himself to a stepmother in the event that Mr. Christman's marriage plans materialized. Mrs. O'Connor has, since the last hearing, married Mr. O'Connor and has expressed her intention to lead an upright and moral life. See: *Oulette v. Oulette,* 246 Md. 604 and *Shanbarker v. Dalton,* 251 Md. 252. The sincerity of her intentions cannot, of course, be determined with assurance. This Court, with some reservations, is inclined to believe her. The passage of years, moreover, has a wonderful way of working towards respectability.

"The Court of Special Appeals, in its opinion in this case, said in part: 'That while marriage to the former lover is not, in and of itself, sufficient to show that a person who had engaged in adulterous or illicit sexual relations is a fit and proper person to raise a child, it is a factor which may be considered in determining fitness ... and that the mother's attitude toward her past misconduct is also a relevant factor to be considered.' Of course the principal rule by which this Court must make its determination is the rule that the best interests of the child is the overriding factor.

"The recent case of *Sartoph v. Sartoph,* 31 Md. App. 58 (1976) contains statements which are pertinent to the issue here. The Court in that opinion said:

'Accepting the chancellor's finding that the father was a fit and proper custodian of the child,

---

**3.** [Mrs. O'Connor had testified that Mr. Kane, an attorney, had advised her she was legally married as the result of a common law marriage to Mr. O'Connor.]

the question now before us is whether, in our best judgment, the chancellor's award, which transferred Ronald's custody from the mother to the father, serves Ronald's best interests.

'The custody of children should not be disturbed unless there is some strong reason affecting the welfare of the child. To justify a change in custody, a change in conditions must have occurred which affects the welfare of the child and not the parents. The reason for this rule is that the stability provided by the continuation of a successful relationship with a parent who has been in a day to day contact with a child generally far outweighs any alleged advantage which might accrue to the child as a result of a custodial change. In short, when all goes well with children, stability, not change, is in their best interests.

'Here, the record shows that Ronald has been in the care and custody of his mother his whole life. Since the separation of the mother and father, during the school year he has spent weekdays with the mother and alternate weekends with the father. He spent the last summer with the father, and planned to spend the next summer with him as well. Under this arrangement, Ronald has grown into a healthy, emotionally well-adjusted child, who is doing well at home and at school.

'In the absence of any evidence that the mother is presently unfit to care for this child, or that the child is experiencing any kind of difficulty, there is nothing in this record which justifies a change in custody. The stability to be provided by a continuation of the child's present relationship with his mother in his successful living environment far outweighs any alleged advantage which might accrue to him as a result of a custodial change.'

"This Court thinks that the facts in the case at bar warrant a similar conclusion. It therefore finds that the best interest

of Brian would be served by continuing his custody with his mother with liberal visitation rights to his father."

On the very day the present appeal was argued in our Court, the Court of Appeals made changes in the rules we should follow in custody cases. *Davis v. Davis, supra.* On page 10 of that slip opinion, the Court said:

> ". . . whereas the fact of adultery may be a relevant consideration in child custody awards, no presumption of unfitness on the part of the adulterous parent arises from it; rather it should be weighed, along with all other pertinent factors, only insofar as it affects the child's welfare."

In addition, the Court found that our prior concept of our responsibility in custody cases was in error and recited the new rules as follows:

> "In sum, we point out three distinct aspects of review in child custody disputes. When the appellate court scrutinizes factual findings, the clearly erroneous standard of Rules 886 and 1086 applies. If it appears that the chancellor erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the chancellor founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the chancellor's decision should be disturbed only if there has been a clear abuse of discretion." (footnote 4 omitted). *Davis v. Davis, supra* at 125-26.

This has been further explained by the Court of Appeals in *Ross v. Hoffman,* 280 Md. 172, 372 A. 2d 582 (1977):

> "The teaching of *Davis v. Davis, supra,* is plain. The ultimate conclusion as to the custody of a child is within the sound discretion of the chancellor. That conclusion is neither bound by the strictures

of the clearly erroneous rule, that rule applying only to factual findings of the chancellor in reaching the conclusion, nor is it a matter of the best judgment of the reviewing court. It is not enough that the appellate court find that the chancellor was merely mistaken in order to set aside the custody award. Rather, the appellate court must determine that the judicial discretion the chancellor exercised was clearly abused. This is the principle which controls the review of any matter within the sound discretion of a trial court as distinguished from a judgment falling squarely within the ambit of the clearly erroneous rule." *Id.* at 186.

In the instant case we find there have been no errors of law, no clear errors of fact, and there has been no clear abuse of discretion.

In his brief, the appellant argues, of course, without the benefit of the most recent guidance by the Court of Appeals, first that the appellant had established his capacity to care for the child. With this argument we generally agree, subject to the qualifications expressed by Judge Macgill in his opinion quoted above, but this, of course, is not the determining factor. It merely enables appellant to be considered as one of the possible custodians. Second, the appellant points to the language of the trial court concerning his reservations as to the future or conduct of Mrs. O'Connor. By the very nature of life none of us can state with absolute certainty what anyone's conduct will be in the future. In such a doubtful area it is most important that we give deference to the superior position of the trial judge to make such fine judgments after having seen and heard the parties testify in his presence.

Finally, the appellant argues that the appellee had the burden to establish that she had overcome her prior adulterous disposition. Of course, we now know under *Davis v. Davis, supra,* that she had no such burden and that her prior adulteries were only one factor to be considered by the

trial judge. His opinion evidences most clearly that he gave proper consideration to that factor. We, therefore, affirm the decree of the chancellor awarding custody of Brian Burdell Christman III to Lorraine Rose Farinick O'Connor.

Mrs. O'Connor has filed an appeal alleging that the trial court erred in awarding her support payments in the amount of only $80.00 per month and in awarding only $500 in counsel fees. The record shows that Mr. Christman has been making voluntary payments in support of his son since 1971 and that he, at the time of the hearing below, was voluntarily paying the sum of $80 per month. It also shows that Mrs. O'Connor had never made a claim for a legal order for support until after such procedure was suggested in our prior opinion and after remand to the trial court. As pointed out by the trial judge, she never testified as to the amount of the expenses of the child, although a written statement was filed which showed them to be $209.52 per month. Inasmuch as through the years the parties hereto have been able to work out, between themselves, the amount of child support and in view of Mrs. O'Connor's failure to seek court ordered support until suggested by this Court and in view of her failure to testify as to the child's needs and expenses, we cannot say that the chancellor abused his discretion in fixing the support payments at $80, the amount the parties had voluntarily agreed upon prior thereto.

With reference to the counsel fees, the trial judge found as follows:

"Mrs. O'Connor testified that she was working twenty hours per week at two dollars and forty-six cents per hour for The Hecht Company, a department store, to help pay her legal fees in this case. As she expressed it, it would take her twenty years, on such a salary, to pay her lawyer's fees. Mr. Christman is paid a base salary of ten thousand, eight hundred dollars per annum plus a bonus and the use of a company car. His net pay is three hundred and eight dollars bi-weekly. He testified that he owed his parents forty-five hundred dollars and he owed five hundred dollars on an account with Master Charge, together with one hundred and fifty dollars for a hospital bill. He is presently voluntarily

paying to Mrs. O'Connor the sum of eighty dollars per month for the support and maintenance of Brian. His expenses, including the payment for support, appear to be something in excess of five hundred dollars per month. His net income per month, as this Court figures it, amounts to approximately six hundred and sixty-seven dollars. Under the circumstances this Court concludes that Mrs. O'Connor should be allowed a fee of five hundred dollars for her counsel."

It was stipulated that Mrs. O'Connor had incurred counsel fees totalling $4,730.50 in the two trials before the chancellor and in the prior appeal, of which she had paid the sum of $1,168.00, leaving a balance of $3,562.50 and that her counsel would testify that the fees were reasonable. After reciting the facts we have quoted above, the chancellor awarded her $500 toward her counsel fees. We think in this area the chancellor abused his discretion and a total fee of $1,500 would be appropriate.

*Decree affirmed except counsel fees*
*increased from $500 to $1,500.*
*Appellant to pay the costs.*