674 A.2d 1

**Robin L. WAGNER (Schwartz)**

v.

**Richard B. WAGNER.**

No. 608, Sept. Term, 1995.

Court of Special Appeals of Maryland.

Feb. 6, 1996.

Reconsideration Denied April 30, 1996.

2

4

6

Mercedes C. Samborsky, Joppatowne, for appellant.

Marc G. Rasinsky (Scott & Rasinsky, on the brief), Westminster, for appellee.

Argued before BLOOM, FISCHER and CATHELL, JJ.

CATHELL, Judge.

In an Order dated November 17, 1994, the Circuit Court for Carroll County (Beck, J., presiding) awarded permanent custody of the parties' two minor children to appellee, Richard Wagner (Mr. Wagner). The court further found appellant, Robin Wagner (Ms. Wagner),[1] to have voluntarily impoverished herself. She now appeals to this Court, charging, *inter alia*, that the circumstances leading to the trial court's Order deprived her of due process of law. Namely, she contends that she was not given notice of, and an opportunity to prepare for, various hearings that took place in the years following her divorce from Mr. Wagner. She is further aggrieved by other of the court's rulings and presents the following questions for our consideration, which we renumber as follows:

1. Did the court violate appellant's constitutional due process rights to notice, opportunity to be heard, opportunity to prepare for the hearing and opportunity to defend claims, during the proceedings below?

2. Did appellee satisfy his burden of proving a change of circumstances to justify a change in Erika's custody, either in 1992 or 1994?

3. Did the trial court abuse its discretion when on April 2, 1992 it granted appellee "immediate custody" of Erika without making any provisions to protect Erika from the risk of continued sexual abuse and without an evidentiary hearing?

---

**1.** Since the cause of action was begun, Ms. Wagner has legally changed her name to reflect her maiden name, Schwartz. For purposes of this opinion, however, we shall continue to refer to her by her married name.

4. Did the court err in failing to acknowledge that appellant was justified in declining to send eight-year-old Erika for grandparent visitation where appellant had reason to believe that Erika would be exposed to the danger of continuing sexual abuse by appellee and such action was against Colorado DSS recommendations and court motion?

5. Did the trial court err when it ruled that appellant had voluntarily impoverished herself?

6. Did the trial court abuse its discretion when it relied on the statements made by the children at the *in camera* interviews, absent questions establishing their competency?

7. Did the trial court abuse its discretion in assessing counsel fees against appellant where the court failed to make the findings mandated by statute, Md.Code, Family Law Art. § 12–103, to justify such assessment?

8. Did the trial court abuse its discretion when it denied appellant's request to transfer this case to Anne Arundel County?

As we attempt to wade through the plethora of pleadings that has characterized the instant case from its outset, the gravity of the situation presented to this Court and to which the two children involved have been subject will become apparent. We also keep in mind that "[o]verarching all of the contentions in disputes concerning custody or visitation is the best interest of the child[ren]." *Hixon v. Buchberger*, 306 Md. 72, 83, 507 A.2d 607 (1986).

## CHRONOLOGY OF THE CASE

The parties were wed on February 16, 1979. Of the union, two children were born: Kristopher Richard (Kris), on June 9, 1981, and Erika Ashley, on April 21, 1984. The family moved to Carroll County in December of 1986; one month later, Ms. Wagner declared her desire that the parties divorce. On March 30, 1987, Ms. Wagner initiated a separation by leaving the marital home with two-year-old Erika; five-year-old Kris

refused to go. The next day, after an unsuccessful and surreptitious attempt by Ms. Wagner to remove Kris from school, Mr. Wagner filed in the Circuit Court for Carroll County a Complaint for Immediate Custody of both children. Thereafter, he filed an Amended Complaint for Limited Divorce. On April 1, 1987, Ms. Wagner filed in the Circuit Court for Anne Arundel County a Complaint for Limited Divorce on grounds of extreme cruelty. The matter was transferred by consent to the Circuit Court for Carroll County on May 4, 1987. *Pendente lite* custody arrangements, ordered on April 7, 1987, called for Erika to remain with Ms. Wagner, and Kris with Mr. Wagner. This *pendente lite* order was followed by a hearing before a Master on July 7, 1987, at which twenty-nine witnesses took the stand over a course of four days. The Master's ensuing recommendation continued the *pendente lite* arrangement and rejected each party's claim that the other was an unfit parent. No exceptions were taken therefrom, and the trial court incorporated the Master's recommendations in an Order issued October 6, 1987, which similarly continued the existing *pendente lite* custody arrangements. No allegations of sexual child abuse surfaced at this time.

A five-day trial on the merits of the parties' complaints began on May 16, 1988 and was characterized by the trial court as

all out "warfare" to portray the other party as an "unfit parent." [Ms. Wagner] attempted to portray [Mr. Wagner] as an alcoholic who "did not know his own strength" when drinking. [Mr. Wagner] attempted to portray [Ms. Wagner] as an adulterous woman who placed her career and extramarital relationships ahead of her children. Despite the week long trial and multitude of witnesses, the parties were totally unsuccessful in besmirching each other's character.

The trial court subsequently granted Mr. Wagner a divorce *a vinculo matrimonii* on grounds of desertion, having found Ms. Wagner to be at fault for the demise of the marriage. The court denied Ms. Wagner's Complaint, and the *pendente lite*

custody arrangements were accorded permanent status. Thereafter, a visitation schedule was devised. No allegations of sexual child abuse were made during the trial.

The litany of pleadings did not abate following the parties' divorce. In fact, it increased substantially, characterized, on one hand, by allegations that Ms. Wagner was impeding Mr. Wagner's visitation with Erika and, on the other, by accusations of Mr. Wagner's violence and abuse against Ms. Wagner. Each pleading sought a change in custody or modification of visitation. Mr. Wagner's Complaint for Ex Parte Relief, filed September 16, 1988, was no exception. This was to be his first of eight such complaints. It alleged that Ms. Wagner was planning to leave Maryland with Erika, without informing him thereof or seeking his consent. Though the court granted Mr. Wagner temporary custody of the child, that order was rescinded on September 30, 1988, and Ms. Wagner regained custody of Erika, expressly conditioned upon her continued residence in Maryland. No allegations of sexual child abuse were made during those proceedings.

The issue of Ms. Wagner's relocation remained at the forefront of the case until December of 1989, when the court approved an agreement between the parties, whereby it was agreed that Ms. Wagner could move to Colorado with Erika. A revised visitation schedule as well as provisions for telephone contact between Erika and her brother and father were included in the Agreement. No allegations of sexual child abuse surfaced at the time of the agreement.

Thereafter, Mr. Wagner filed the following Supplemental Complaints requesting changes to the original decree:

· Second Supplemental Complaint, on January 5, 1990, based on, *inter alia*, Mrs. Wagner's alleged failure to adhere to the Agreement with regard to his telephone visitation with Erika; [2]

---

2. Prior to the date set for the hearing in the matter, Mr. Wagner filed a second Complaint for Ex Parte Relief, on September 24, 1990, in view of Ms. Wagner's refusal to allow Erika to fly to Maryland for a scheduled visit with him. On October 2, 1990, the court ordered Ms.

- Third Supplemental Complaint, on January 18, 1991, wherein Mr. Wagner sought, among other things, child support and contended that Mrs. Wagner had allowed Erika to return to Maryland on several occasions without notifying him;
- Fourth Supplemental Complaint, on February 26, 1991, alleging Mrs. Wagner's intentional frustration of attempts to agree as to terms surrounding Erika's visit during the Easter holiday; [3] and
- Fifth Supplemental Complaint, on May 3, 1991, in response to further thwarting by Mrs. Wagner of his visitation with Erika and alleging a substantial change in circumstances that mandated a change in custody of Erika to him. Trial was scheduled for February 5, 1992.

In addition to supplemental complaints, as we have noted, appellee filed several petitions that he characterized as *ex parte* pleadings. Before his third Complaint for Ex Parte Relief, filed April 11, 1991, could proceed to hearing, Mr. Wagner interposed a fourth *ex parte* Complaint,[4] on April 12, 1991. In it, Mr. Wagner disclosed that Ms. Wagner had, on April 9, 1991, secured an Ex Parte Temporary Restraining Order in Colorado, the equivalent of a Maryland Domestic Violence Protective Order, upon her assertion that Mr. Wagner had threatened her over the telephone. The order, which foreclosed Mr. Wagner from maintaining any contact with either his daughter or his ex-wife, was served upon him on

---

Wagner to comply with the visitation schedule to which she had previously agreed.

3. A Complaint for Ex Parte Relief was filed the following day on Ms. Wagner's behalf by her attorney-in-fact, her father, William V. Schwartz, also concerning the Easter holiday. An emergency hearing at which both parties were present was held on March 15, 1991. The matter was held *sub curia* and, on April 19, 1991, the trial court ordered that Erika remain in Colorado and that Kris fly there to visit with his mother.

4. The third and fourth *ex parte* complaints (and the other four *ex parte* complaints) must be distinguished from the five supplemental complaints.

April 11, 1991. Apparently, Ms. Wagner did not, even at this late stage, allege in the Colorado Court the occurrence of sexual child abuse. On April 12, 1991, the Circuit Court for Carroll County denied the Park County, Colorado court order full faith and credit and directed that visitation occur as had been previously arranged, between April 12 and April 15, 1991.

Another Complaint for Ex Parte Relief, filed on June 17, 1991, was again based on Ms. Wagner's failure to permit Mr. Wagner and Erika to engage in telephone visitation. The court deferred consideration of the Complaint until the then scheduled September 11, 1991 hearing date. On October 16, 1991, Mr. Wagner filed a Motion for Emergency Hearing and for Contempt when Ms. Wagner obtained another Colorado court order based on allegations made for the first time that Mr. Wagner and Kris had sexually abused Erika.[5] Ms. Wagner, by her attorney-in-fact, responded with a Motion for Contempt and Other Relief on October 18, 1991, claiming that Mr. Wagner was refusing to allow her to visit with Kris on the telephone. She also responded with a Motion to Strike his Motion for Emergency Hearing on October 31, 1991. Thereafter, Mr. Wagner's October 30, 1991 request that Maryland formally assert its jurisdiction over the matter was immediately followed by his sixth Complaint for Ex Parte Relief, filed November 1, 1991. The latter was prompted by his complete inability to visit with Erika as a result of the two Colorado

---

5. Specifically, on or about September 23, 1991, Erika is reported to have told her babysitter, among others, that her father and Kris had sexually abused her. The circumstances under which these allegations arose are unclear; that is, there is some question as to whether they were initially coerced by Ms. Wagner. Erika stated that she did not want to "get grounded," but whether this refers to her perception that the occurrence of the alleged abuse itself would have gotten her in trouble or the fact that she lied about it is not clear. Kris testified that Erika recanted the allegations in their mother's presence and the record reveals that she did so again during the *in camera* interview with the trial court. There also remains some question as to whether Ms. Wagner believed the recantation. We, however, shall not address this issue any further, as it in no way affects our resolution of the issues raised.

court orders. Ms. Wagner in turn requested, on November 13, 1991, that Maryland defer jurisdiction to Colorado. On December 20, 1991, the court, following a hearing the preceding day on Mr. Wagner's Supplemental Motion for Emergency Hearing and Other Relief, issued an Order that formally asserted Maryland's jurisdiction in the matter, that denied Ms. Wagner's request for deferral of jurisdiction to Colorado, that temporarily suspended the court's 1988 visitation order, and disallowed Kris from visiting in Colorado, in light of his mother's conduct.[6]

A trial on the various issues of child support, child visitation, and attorney fees was held on February 5, 1992, and was continued until April 23, 1992. It was, however, again postponed on this date. In the interim, based on the testimony taken on February 5, 1992, Mr. Wagner's mother requested visitation with Erika successfully. It was scheduled for the week of March 21 to March 27, 1992. The court also stated that Mr. Wagner could visit with Erika during three of those days, provided the visits were supervised. On March 23, 1992, Mr. Wagner's seventh Complaint for Ex Parte Relief revealed that, while visitation arrangements were being made with Erika's grandmother, Ms. Wagner had sought yet another restraining order in Colorado three days earlier; the Colorado court declined, however, to hear the matter in light of the formal assertion of jurisdiction by Maryland. It was then that Ms. Wagner appeared to employ a different avenue for preventing her daughter's scheduled visitation in Maryland, by informing Mr. Wagner that Erika was ill and thus unable to fly to Maryland. A March 26, 1992 Order by the Circuit Court for Carroll County directed that visitation be rescheduled for March 28 to April 3, 1992. Ms. Wagner did not heed this Order either, and on April 2, 1992, Mr. Wagner filed his

---

6. Ms. Wagner filed an appeal from this Order to this Court, along with a Motion for Stay Pending Appeal. Mr. Wagner moved to dismiss same. The Motion for Stay was denied as to all issues except that concerning Kris's visitation with her in Colorado. We affirmed in an unreported opinion. *Wagner v. Wagner*, 94 Md.App. 772 [No. 136, 1992 Term, *per curiam*, filed November 17, 1992].

eighth Complaint for Ex Parte Relief. The Complaint advised the court of Ms. Wagner's continued disregard of its visitation Order. It further revealed that Erika had not been at school and that Ms. Wagner was "absent without leave" from her job with the Department of Defense. "In short, it appeared that [Ms. Wagner] had absconded from Colorado with Erika and had gone 'underground.'" After a hearing on the matter, the trial court ordered, on April 2, 1992, that Mr. Wagner be given "immediate custody" of his daughter.[7] While the trial court did not characterize its written order as a *pendente lite,* or temporary, order, it made comments consistent with *pendente lite* status. Two years later, in an opinion rendered on all open issues, it noted that the April 2, 1992 Order had been a temporary one.

It was on or about April 23, 1992 that Mr. Wagner was finally able to locate his ex-wife and Erika; they were in California at a woman's shelter, using assumed names. The trial court's April 2, 1992 Order was then enrolled in California and accorded full faith and credit. Based thereon, Mr. Wagner was able to effect the return of Erika to Maryland. Shortly after her daughter's return to Maryland, Ms. Wagner returned as well, residing with her parents in Anne Arundel County. She thereafter filed a Complaint for Visitation on June 2, 1992.

A hearing was held on December 24, 1992 before a Domestic Relations Master in order to determine the amount of child support Ms. Wagner would be obligated to pay. Both parties excepted to the Master's recommendations. Prior to the trial court's April 23, 1993 hearing on the matter, Ms. Wagner's parents interposed an unsuccessful request that the case be transferred to the Circuit Court for Anne Arundel County in order that they might argue their claim for grandparental visitation in that court. Subsequently, on May 7, 1993, the court issued an Order that Ms. Wagner pay $1,180 per month

---

7. On this date, Mr. Wagner also filed a successful Complaint for Contempt and for suit fees incurred by reason of Ms. Wagner's failure to adhere to the visitation schedule.

in child support. The obligation, however, was suspended as of April 23, 1993 in light of the fact that Ms. Wagner had been laid off from work; the obligation would resume once she secured other employment or was found to be voluntarily impoverished. The court did not rule on Mr. Wagner's claim for retroactive child support for the period between April 23, 1992, when Mr. Wagner regained custody of Erika, and the December 24, 1992 hearing. Mr. Wagner subsequently filed a Complaint for Modification of Visitation on May 10, 1993, requesting that any visitation granted to Ms. Wagner be supervised.

The trial court again heard from Mr. Wagner on July 20, 1993, when he filed a Complaint for Contempt based on Ms. Wagner's failure to pay child support despite having obtained employment. A hearing on all open matters, scheduled for February 22, 1994, did not take place, and the matter was continued. The court did conduct, at Ms. Wagner's request, *in camera* interviews with Erika and Kris at that time. Because a hearing on all issues could not readily be held, one solely addressing visitation took place on April 6, 1994 at the request of counsel. Mr. Wagner's initial Complaint for Modification of [Ms. Wagner's] Visitation was considered moot in light of a voluntary agreement reached by the parties for unsupervised visitation. A visitation schedule was established, and a third party was appointed to act as intermediary to facilitate the exchange of the children.

The court later conducted further interviews with the children in conjunction with the full hearing that was held on September 28, 1994. During those interviews, which the court "did not conduct ... to establish the children's preference," the children relayed what the court later termed "disturbing revelations" about Ms. Wagner's behavior when they visited with her. Kris stated that Ms. Wagner had electronically taped one of their visits. He also stated that Ms. Wagner maligned her ex-husband, repeatedly stating to the children that he would hurt or kill her, and that he had lied to them. She is said to have slapped Kris and used profanity in his presence. Kris then told the court of a baseball game from

which Ms. Wagner removed him because Mr. Wagner "showed up." More important, Kris described an incident relating to Erika's allegations of sexual abuse. He stated:

KRIS: ... [W]e were sitting on the couch. I don't know why, but for some reason, Erika asked her [Ms. Wagner] that question.

THE COURT: Asked who?

KRIS: ... She said, "Why did you make me lie about that question?" And I can't remember what I said.... I was right there sittin[g] next to her [Ms. Wagner]....

....

... And she [Ms. Wagner] said, "Well, we did," meaning dad and me abused [Erika].

Kris went on to admit that it was he who had requested that visitation with Ms. Wagner be supervised. He stated that he would "feel more comfortable if someone would be there, because I know she wouldn't do that [among other things, "say bad stuff about dad," "calling him a liar," "hitting us and trying to wash our mouth out"] in front of maybe a friend or someone else." Kris added that he would like to continue visiting with his mother "[a]s long as she stops lying and just acts like a normal mother." By "normal," Kris meant "[s]top telling lies about dad and me.... Like she can put me in time out or something, but she doesn't have to wash my mouth out.... She doesn't have to slap me...." By way of explaining her conduct, the trial court noted that a psychologist counseling Ms. Wagner testified that Ms. Wagner was suffering from "symptoms consistent with post traumatic stress syndrome; that Ms. Wagner suffered anxiety because of abuse from Mr. Wagner during the marriage; that Ms. Wagner had herself been sexually abused as a child by a relative; that Ms. Wagner suffers 'flashbacks' when she comes to court; [and] that Ms. Wagner considered the trial court's rulings as 'acts of abuse' against her."

Erika confirmed much of what Kris had told the court. She also described several instances in which Ms. Wagner took away medicine that had been given to her and to Kris by Mr.

Wagner's new wife, a doctor who practices with the children's regular pediatrician. Erika further stated that, though her mother had never done so, she had threatened to take Erika out of a sporting event if her father appeared to watch her, because, " 'It's not [his] time [with her].' " When questioned about her feelings concerning continued visitation with her mother, Erika indicated that two weeks with her mother in the summer was "too long" and "boring," and that she was unsure whether the visits she did have with her should be supervised, given that the supervisor would be with them the entire weekend. She did, however, indicate that she "[did]n't really want to go to mom's if she's not gonna act right," meaning "not smacking us and not yelling at us just because we have ... medicine and taking it away from us. I don't want her to say ... any more cuss words." She admitted feeling uncomfortable during visitation but was agreeable to its continuation if her mother ceased to do that which she had described to the court. When the interview turned to Erika's allegations of abuse by her father and brother, she stated: "I tr[ied] to tell mom that it's not really true, [be]cause it's not. I just didn't want to get grounded. But she doesn't listen to me. She said, 'Yes. It's really true.' ... I keep trying to tell her, but she says, 'No.' ... She won't believe me." Erika then stated that Ms. Wagner had told Kris that she knew that he and Mr. Wagner "did that to Erika."

The September 28, 1994 hearing was on *all pending issues*—namely, Mr. Wagner's Fifth Supplemental Complaint seeking permanent custody of Erika (including his eight complaints for *"ex parte"* relief), Ms. Wagner's Complaint for Visitation, the retroactivity of child support, Mr. Wagner's Complaint for Contempt, arising from nonpayment of child support, and the reimbursement of Mr. Wagner's attorney's fees. The trial court held the matter *sub curia* and, on November 17, 1994, issued the Order from which Ms. Wagner appeals. The trial court, as shall we, addressed each issue *seriatim.*

Regarding the custody of Erika, the trial court recounted the testimony of those witnesses it deemed important in

reaching its decision that the best interests of Erika, as well as Kris, lay in remaining in Mr. Wagner's custody permanently. The court further concluded:

[Ms. Wagner]'s allegations of [Mr. Wagner]'s abusive behavior are pure fiction and self-serving at best. This is particularly true given the fact that although the parties had been through a four ... day Master's hearing and a five ... day Court trial during which the central issue was custody, no allegations regarding abuse were ever made. Indeed, the first such allegation was made *after* [Mr. Wagner] requested a change in custody.

The children were found to be "flourishing" in Mr. Wagner's care, doing well in school, and participating in sports; consideration of the criteria set forth in *Montgomery County Dep't of Social Servs. v. Sanders*, 38 Md.App. 406, 420–21, 381 A.2d 1154 (1977),[8] pointed toward a custody award to Mr. Wagner. The court then, with "some degree of hesitation," granted Ms. Wagner's request for unsupervised visitation. The court did note, however, that continued conduct by Ms. Wagner in the form of disparaging statements about Mr. Wagner and Kris "could possibly give rise to a finding that supervised visitation is in the children's best interests."

Relying on Maryland Code (1984, 1991 Repl.Vol.), § 12–204(b) of the Family Law Article (FL) and *Krikstan v. Krikstan*, 90 Md.App. 462, 601 A.2d 1127 (1992), the court awarded retroactive child support for the period between April 23 and December 24, 1992. Additionally, the court found that Ms. Wagner had voluntarily impoverished herself to avoid paying child support. The court declined, however, to find Ms. Wagner in contempt of its May 7, 1993 Order—which called

---

**8.** *Montgomery County Dep't of Social Servs. v. Sanders*, 38 Md.App. 406, 381 A.2d 1154 (1977), was not a custody conflict between the child's two natural parents. Rather, it involved an attempt by a third party to terminate the parental rights of both natural parents. For whatever reason, the criteria set forth therein to guide a court in deciding whether to terminate a natural parent's rights have gradually become established as defining the best interest of the child standard as applied to adoption *and custody* cases, including those involving interparental conflicts.

for reinstatement of Ms. Wagner's child support obligation either two weeks after she became employed, upon a finding of voluntary impoverishment, or upon the court's order—because Ms. Wagner had not realized any income from her new job and because she had not previously been found to be voluntarily impoverished. The court did, however, recalculate her obligation as being $1,011.10, and ordered that she contribute $2,500.00 toward Mr. Wagner's attorney's fees given the fact that "many of the proceedings necessitated in th[e] case were the result of [Ms. Wagner]'s unreasonable conduct ... [and her] refusal to pay child support as a result of her voluntary impoverishment."

We now address appellant's questions.

## I.

**Did the court violate appellant's constitutional due process rights to notice, opportunity to be heard, opportunity to prepare for the hearing and opportunity to defend claims, during the proceedings below?**

■ Ms. Wagner contends that her constitutional due process rights were "continually violated during the proceedings below." She claims that she was not provided with notice of hearings in some instances and that *ex parte* orders were issued without a hearing in others. We first note that these procedural matters became subsumed in later proceedings that have not given rise to specific due process arguments. In any event, Mr. Wagner disputes these assertions on procedural as well as substantive grounds. We agree substantially with him, noting, from the outset, that Ms. Wagner's contentions in this regard have become moot.

■ While interlocutory orders in domestic cases may, in most instances be appealed after a final order, in some circumstances, the final order moots the issues that might have existed earlier in the proceedings. In the case *sub judice,* we hereafter affirm that the trial court neither erred nor abused its discretion when it rendered its 1994 custody order. We lack the power to reverse time in order to transfer the child's

custody between 1992 and 1994 to Ms. Wagner, even were we to desire to do so. In respect to this particular issue, no remedy is now possible. The issue has become, by passage of time and subsequent court action, moot. However, the due process concerns are raised in a factual context that has not heretofore been addressed, *i.e.*, a custodial parent fleeing from a court having jurisdiction and going underground with a child under assumed names in order to avoid the reach of that court, resulting in an emergency hearing that itself results in a modification of custody. We believe it important to resolve whether the holding of such emergency hearings under these circumstances is a violation of due process standards. Once we resolve the issue, it need not, when subsequent proceedings in future cases moot preliminary issues, be again addressed.

Article 24 of Maryland's Declaration of Rights states: "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the Land." [9] Just what process is due is determined by an analysis of the particular circumstances of the case, including the functions served and interests affected. *Techem Chemical Co. v. M/T Choyo Maru*, 416 F.Supp. 960, 968 (D.Md.1976). Due process, however, does not mean that a litigant need be satisfied with the result. *Bugg v. Maryland Transport. Auth.*, 31 Md.App. 622, 630, 358 A.2d 562 (1976), *appeal dismissed*, 429 U.S. 1082, 97 S.Ct. 1088, 51 L.Ed.2d 529 (1977). Neither does it necessarily mean "judicial process." Indeed, it is sufficient if there is at some stage an opportunity to be heard *suitable to the occasion* and an *opportunity* for judicial review at least to ascertain whether the fundamental

---

**9.** This section and the Fourteenth Amendment to the United States Constitution have the same meaning and, thus, Supreme Court interpretations of the Fourteenth Amendment function as authority for interpretation of Article 24. *Pitsenberger v. Pitsenberger*, 287 Md. 20, 27, 410 A.2d 1052, *appeal dismissed*, 449 U.S. 807, 101 S.Ct. 52, 66 L.Ed.2d 10 (1980).

elements of due process have been met. *Burke v. Fidelity Trust Co.*, 202 Md. 178, 188, 96 A.2d 254 (1953). Moreover, with respect to legal issues, due process does not even necessarily require that parties be given an opportunity to present argument. *Blue Cross of Maryland, Inc. v. Franklin Square Hosp.*, 277 Md. 93, 103–04, 352 A.2d 798 (1976).

Due process, thus, is a flexible concept that calls for such procedural protection as a particular situation may demand. *International Caucus of Labor Comm. v. Maryland Dep't of Transport.*, 745 F.Supp. 323, 329 (D.Md.1990); *Department of Transp. v. Armacost*, 299 Md. 392, 416, 474 A.2d 191 (1984), *rev'd on other grounds*, 311 Md. 64, 532 A.2d 1056 (1987); *Attorney Grievance Comm. v. Reamer*, 281 Md. 323, 333, 379 A.2d 171 (1977); *Lomax v. Comptroller of the Treasury*, 88 Md.App. 50, 57, 591 A.2d 1311 (1991); *Vavasori v. Commission on Human Relations*, 65 Md.App. 237, 245, 500 A.2d 307 (1985), *cert. denied*, 305 Md. 419, 504 A.2d 1152 (1986). It does not require procedures so comprehensive as to preclude any possibility of error. *International Caucus*, 745 F.Supp. at 329–30. Stated another way, due process merely assures *reasonable* procedural protections, appropriate to the fair determination of the particular issues presented in a given case. *See generally Plato v. Roudebush*, 397 F.Supp. 1295, 1310 (D.Md.1975); *see also Golden Sands Club Condominium, Inc. v. Waller*, 313 Md. 484, 496, 545 A.2d 1332 (1988) (Whether the method of notice given in a particular case is reasonable depends on the specific circumstances of that case.). Therefore, the asserted denial of due process is to be tested by an appraisal of the totality of the facts in a given case. *Betts v. Brady*, 316 U.S. 455, 462, 62 S.Ct. 1252, 1256, 86 L.Ed. 1595 (1942). Notably, there is no requirement that actual prejudice be shown before denial of due process can be established. *Town of Somerset v. Montgomery County Bd. of Appeals*, 245 Md. 52, 66, 225 A.2d 294 (1966).

Once it is determined that an interest is entitled to due process protection, the pertinent inquiry then becomes what process is due, a determination that requires consider-

ation and accommodation of both government and private interests; a balancing of the various interests at stake. *See Pitsenberger v. Pitsenberger,* 287 Md. 20, 30, 410 A.2d 1052, *appeal dismissed,* 449 U.S. 807, 101 S.Ct. 52, 66 L.Ed.2d 10 (1980). Plainly stated, due process is not to be evaluated in a vacuum. Its purpose is to assure basic fairness of procedure and, if departure from procedure results in unfairness, it may be said to deny due process; if no unfairness results, there is no denial of due process. *Moss v. Director, Patuxent Instit.,* 32 Md.App. 66, 74, 359 A.2d 236 (1976), *rev'd on other grounds,* 279 Md. 561, 369 A.2d 1011 (1977). With these considerations in mind, we turn to the case *sub judice.*

 Ms. Wagner alleges that her due process rights were abridged when she was not provided with "notice, opportunity to be heard, opportunity to prepare for a hearing and opportunity to defend claims." As stated, to be entitled to the protection of procedural due process, an individual must have a property or liberty interest warranting protection by the Fourteenth Amendment. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972); *Baruah v. Young,* 536 F.Supp. 356, 364 (D.Md. 1982). Ms. Wagner, as a parent, has a protectible liberty interest in the care and custody of her children, *Weller v. Department of Social Servs.,* 901 F.2d 387, 391 (4th Cir.1990), and when a state seeks to affect the relationship of a parent and child, the due process clause is implicated, *Williams v. Rappeport,* 699 F.Supp. 501, 505 (D.Md.1988), *aff'd sub nom. Williams v. Dvoskin,* 879 F.2d 863 (4th Cir.), *cert. denied,* 493 U.S. 894, 110 S.Ct. 243, 107 L.Ed.2d 193 (1989); *see also Lassiter v. Department of Social Servs.,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). Nevertheless, although Ms. Wagner correctly states that the right to a hearing embraces an adequate opportunity to defend, *Christhilf v. Annapolis Emergency Hosp. Ass'n,* 496 F.2d 174, 178 (4th Cir.1974), even if she was not afforded an oral hearing (and we do not so hold), it does not necessarily mean that she was denied due process, *Monumental Health Plan, Inc. v. Department of Health & Human Servs.,* 510 F.Supp. 244, 248 (D.Md.1981).

Though the opportunity to be heard is commonly considered a procedural right, its denial *vel non* must be determined "by the substance of things, and not by mere form." *Simon v. Craft*, 182 U.S. 427, 436, 21 S.Ct. 836, 839, 45 L.Ed. 1165 (1901). We therefore look, as we must, to the facts and interests involved and to the proceedings to determine whether Ms. Wagner either appeared or had the opportunity to appear. In essence, we shall determine if, in the instant case, Ms. Wagner was afforded the due process warranted by the interests at issue.

At the time of the April 2, 1992 hearing, the trial court was faced with knowledge that Erika had not been at school for a significant period of time, Ms. Wagner had neither reported to work nor complied with the court's visitation orders, and neither mother nor child could be located with any certainty. The court was familiar with the case and the plethora of pleadings that characterized it. Erika had borne the brunt of her parents' acrimonious domestic dispute, and the court was naturally concerned about her whereabouts and welfare. In the multitude of prior pleadings and proceedings, Ms. Wagner had never alleged that Mr. Wagner had sexually abused the child. This issue only arose after Mr. Wagner sought a change in custody. (While the timing of such an allegation is certainly relevant in assessing credibility, the timing is not necessarily the conclusive factor in that assessment. There may well be many factors that contribute to the timing of these types of allegations, including that, in many cases, they may be inherently difficult to make.) At the final hearing, the trial court concluded that Ms. Wagner's sexual abuse allegations had been investigated "four times in three jurisdictions" and had been found to be unsubstantiated. Moreover, the court noted that it was the director of the California "safe house" to which Ms. Wagner fled that had informed Mr. Wagner of Erika's whereabouts out of concern for Erika's safety in light of *Ms. Wagner's* behavior.

The facts, as presented by Mr. Wagner and accepted by the trial court, warranted swift action, and our review of

the record finds support for the trial court's immediate transfer of *pendente lite* custody to Mr. Wagner. We note again that Ms. Wagner's attorney was present at the hearing and was heard on her behalf. Thus, Ms. Wagner was aware of the proceeding, or should have been aware of it, through counsel. Additionally, Ms. Wagner had the opportunity to appeal the order if she felt aggrieved thereby, but choose not to do so. In Erika's best interests, the court ordered custody transferred to Mr. Wagner, but strongly urged Ms. Wagner's attorney (who, as we have said, had notice of and was present at the hearing) to file an immediate request for relief if there were a "satisfactory explanation" for Ms. Wagner's conduct: "[T]he best course of action is to change custody, find this child, and get an explanation from [Ms. Wagner]." We agree that, given the history of the instant case and the allegations contained in the petitions, most of which the trial court later substantiated, it was virtually the only correct course of action. It was Ms. Wagner who chose to abscond to California with the child rather than appear for the hearing. Her own attorney, who was present at the hearing to represent her interests, indicated that she had left six to eight messages for Ms. Wagner over a five-day period but had not heard back from her. Ms. Wagner's absence from the hearing was of her own doing. Due process does not mandate a prior hearing in cases where emergency action may be needed to protect a child, *Weller*, 901 F.2d at 393, especially when the missing party's attorney of record is fully apprised of the proceeding and attends. The trial court was concerned about the child and her whereabouts. We cannot say that, under these circumstances, appellant was denied due process or that the court then erred in awarding Mr. Wagner temporary custody.

## II.

**Did appellee satisfy his burden of proving a change of circumstances to justify a change in Erika's custody, either in 1992 or 1994?**

We first note that, at oral argument, Ms. Wagner's counsel seemed to argue that the trial court should not have based its

decision in respect to a change in circumstances on the circumstances that existed in 1994, but, rather, should have resolved that issue based on the situation as it existed in 1992. As we read the trial court's November 17, 1994 Opinion and Order, we do not perceive that it there made any decision at all as to a change in circumstances. It had found a change in circumstances in 1992 and, at that time, ordered a change in custody, albeit on a temporary basis, to Mr. Wagner.

Before addressing the case law pertinent to Ms. Wagner's argument, it may be helpful to redefine the procedural steps required to be taken in child custody modification cases. A change of custody resolution is most often a chronological two-step process. First, unless a material change of circumstances is found to exist, the court's inquiry ceases. In this context, the term "material" relates to a change that may affect the welfare of a child. *See McCready v. McCready,* 323 Md. 476, 593 A.2d 1128 (1991). Moreover, the circumstances to which change would apply would be the circumstances known to the trial court when it rendered the prior order. If the actual circumstances extant at that time were not known to the court because evidence relating thereto was not available to the court, then the additional evidence of actual (but previously unknown) circumstances might also be applicable in respect to a court's determination of change. If a material change of circumstance is found to exist, then the court, in resolving the custody issue, considers the best interest of the child as if it were an original custody proceeding. Certainly, the very factors that indicate that a material change in circumstances has occurred may also be extremely relevant at the second phase of the inquiry—that is, in reference to the best interest of the child. If not relevant to the best interest of the child, the changes would not be material in the first instance. Because of the frequency with which it occurs, this two-step process is sometimes considered concurrently, in one step, *i.e.,* the change in circumstances evidence also satisfies—or does not—the determination of what is in the best interest of the child. Even if it alone does not satisfy the best interest standard, it almost certainly will afford evidentiary support in

the resolution of the second step. Thus, both steps may be, and often are, resolved simultaneously.

If, however, in respect to the previously known circumstances the evidence of change is *not strong enough,* *i.e.,* either no change or the change itself does not relate to the child's welfare, there can be no further consideration of the best interest of the child because, unless there is a material change, there can be no consideration given to a modification of custody. The threshold—but not paramount—issue is the existence of a material change. Once material change, if any, is established, the further relevance of that evidence depends upon how it relates to the best interest of the child; thereafter, the best interest of the child standard controls, *i.e.,* is paramount in the trial court's further determination as to whether to modify custody. In other words, there can be no modification of custody unless a material change of circumstance is found to exist. Even if a material change is found to exist, however, custody can only be modified if it is in the best interest of the child to do so. It is in the "best interest" analysis that the case-created standards of *Sanders, supra,* and its progeny apply.

"The guiding principle of any child custody decision, whether it be an original award of custody or a modification thereof, is the protection of the welfare and best interests of the child." *Shunk v. Walker,* 87 Md.App. 389, 396, 589 A.2d 1303 (1991) (citing, *inter alia, Queen v. Queen,* 308 Md. 574, 587, 521 A.2d 320 (1987), and *Skeens v. Paterno,* 60 Md.App. 48, 61, 480 A.2d 820, *cert. denied,* 301 Md. 639, 484 A.2d 274 (1984)); *see also Levitt v. Levitt,* 79 Md.App. 394, 397, 556 A.2d 1162, *cert. denied,* 316 Md. 549, 560 A.2d 1118 (1989). Indeed, a noncustodial parent is never foreclosed from seeking a change in custody, and Ms. Wagner correctly states that a change in circumstances must be proven by the movant to justify a change in custody.

In the more frequent case, however, there will be some evidence of changes which have occurred since the earlier determination was made. Deciding whether those changes

are sufficient to require a change in custody necessarily requires a consideration of the best interest of the child [because, to be material, the change must relate to the welfare of the child]. Thus, the question of "changed circumstances" may infrequently be [only] a threshold question, but is more often involved in the "best interest" determination.

*McCready,* 323 Md. at 482, 593 A.2d 1128; *see also Domingues v. Johnson,* 323 Md. 486, 498–500, 593 A.2d 1133 (1991); *Bienenfeld v. Bennett–White,* 91 Md.App. 488, 499, 605 A.2d 172, *cert. denied,* 327 Md. 625, 612 A.2d 256 (1992).

▇▇▇ In *McCready,* the mother contended that the chancellor erred in utilizing a best interest of the child standard in considering a change of custody. The Court of Appeals disagreed, opining:

The appropriate standard for determining a contested custody case is the best interest of the child. . . . The question of whether there has been a material change in circumstances *which relates to the welfare of the child* is, however, often of importance in a custody case. . . .

. . . An order determining custody must be afforded some finality, even though it may subsequently be modified when changes so warrant to protect the best interest of the child. . . . "While custody decrees are never final in Maryland, any reconsideration of a decree should emphasize changes in circumstances which have occurred subsequent to the last court hearing." . . .

In the limited situation where it is clear that the party seeking modification of a custody order is offering nothing new, and is simply attempting to relitigate the earlier determination, the effort will fail on that ground alone. In that instance, . . . the absence of a showing of a change in circumstances ordinarily is dispositive, and . . . the chancellor does not weigh the various factors to determine the best interest of the child.

*McCready,* 323 Md. at 481–82, 593 A.2d 1128 (emphasis added; brackets, footnote, and citation omitted). It is this two-fold

burden—that a sufficient change in circumstances exists to sanction a change in custody *and* that a change would be in the child's best interests—that a noncustodial parent must bear in order to prevail in a petition seeking a modification of custody. Once entered, a custody decision "will *ordinarily* not be modified except upon a showing of a change in circumstances justifying a change in custody to accommodate the best interest of the child." *Domingues,* 323 Md. at 492–93, 593 A.2d 1133 (emphasis added) (citing *Hardisty v. Salerno,* 255 Md. 436, 439, 258 A.2d 209 (1969)).

We also regard instructive in our resolution of this issue *Shunk v. Walker, supra,* 87 Md.App. 389, 589 A.2d 1303, a case bearing close factual similarity to the case at bar. There, upon the parties' divorce, the father was awarded custody of their minor child, and the mother was granted visitation rights. Shortly thereafter, the father moved out of state with the child. This, perforce, decreased the mother's ability to visit with the child. Court orders specifying the dates visitation was to take place were disregarded and, as a result, the mother filed numerous motions, including, but not limited to, a motion to modify custody. The father continued to absent himself from the proceedings, and it was soon discovered that he had fled with the child to Canada. In addition to finding the father in contempt, the chancellor awarded custody of the child to the mother, finding that the father's conduct "in failing to appear and produce the child prevented the court from effectively safeguarding the best interests of the child, and created a significant change in circumstances that could well affect the welfare of the child." 87 Md.App. at 395, 589 A.2d 1303. On appeal, the father alleged that the chancellor erred in awarding custody to the mother because there was no evidence to indicate that his conduct adversely affected the child's welfare. We did not agree. Following an exposition of the relevant law, we stated that, in cases where a change in custody from the custodial parent to the noncustodial parent is sought, "[t]he burden ... is clearly on the party 'who affirmatively seeks action by the chancellor ... to show why the court should take that action, and, if he fails to meet that

burden, the action should not be taken.'" *Id.* at 397, 589 A.2d 1303 (quoting *Jordan v. Jordan*, 50 Md.App. 437, 443, 439 A.2d 26, *cert. denied*, 293 Md. 332 (1982)). We continued:

> To warrant a modification of custody, a party must establish that the modification is *necessary to safeguard the welfare of the child* . . . .[10]
>
> When a chancellor finds that the moving party has satisfied this heavy burden and established a significant justification for a change in custody, those findings must be accorded great deference on appeal, and will only be disturbed if they are plainly arbitrary or clearly erroneous.

*Id.* at 398, 589 A.2d 1303 (emphasis added, citations omitted). The father correctly argued that his mere relocation could not serve to justify a change in custody. It did, however, not only render the mother's visitation more difficult, but effectively discontinued any contact between the two given that the child's whereabouts were unknown. It was obviously a change that might have affected the child's welfare. Under those circumstances, we held that the trial court's finding that the father was not the proper person to maintain custody of the child was clearly supported: "[B]y moving twice within brief periods, [the father] has nullified the presumed advantages of continuity and stability." *Id.* at 400, 589 A.2d 1303.

The same may be said for the case *sub judice*. Ms. Wagner contends that Mr. Wagner failed to sustain "his burden of proving a change of circumstances to justify a change in Erika's custody, either in 1992 or 1994." Mr. Wagner, on the other hand, asserts that he put forth ample evidence to substantiate a change in custody. In asserting that Mr. Wagner failed to prove a change of circumstances sufficient to justify a transfer of custody to him, Ms. Wagner

---

10. As explained in *Jordan v. Jordan*, 50 Md.App. 437, 443, *cert. denied*, 293 Md. 332 (1982) (quoting *Sartoph v. Sartoph*, 31 Md.App. 58, 67, 354 A.2d 467, *cert. denied*, 278 Md. 732 (1976)),

 [t]he reason for this rule is that the stability provided by the continuation of a successful relationship with a parent who has been in day to day contact with a child generally far outweighs any alleged advantage which might accrue to the child as a result of a custodial change.

challenges the trial court's April 2, 1992 and November 17, 1994 Orders (1992 Order and 1994 Order, respectively).

It is evident from the record that Mr. Wagner's April 2, 1992 Complaint for Ex Parte Relief was not an attempt to relitigate previously presented custody arguments. He, at that time, had had no contact with his daughter for upwards of two months, and his wife could not be located. Whether this change was sufficient to call into question the court's prior custody decree was a matter for the trial court to determine. In other words, was this change material? Was it likely to affect Erika's welfare? These are questions to be answered by the trial court, and to that determination we accord great deference. We do not hesitate, however, to comment that the patterns of behavior in which Ms. Wagner engaged after the original award of custody in and of themselves undoubtedly had the potential to affect Erika's well-being adversely. They were material changes. Besides being at the center of the dispute between her parents, Erika had relocated twice in as many years.[11] As in *Shunk*, the presumption of continuity and stability in favor of the original custodial parent had been vitiated by Ms. Wagner's attempts to discontinue Mr. Wagner's visitation with Erika and her attempts at subterfuge. In awarding Mr. Wagner immediate, but temporary, custody of the child on April 2, 1992, the trial court was saying that he had met the "heavy burden" to which he was subject in respect to establishing material change and that Erika's best interest at that time lay in paternal custody. Thus, in 1992, the trial court found a material change in circumstances and then, for the purposes of temporary custody, made a determination regarding Erika's best interests. We discern no error or abuse of discretion in the 1992 findings.

_____

11. In addition to the changes we mentioned above, the court was also informed, at the April 2, 1992 hearing, of the fact that, in the two years Erika had been in Colorado, she had been absent from school an inordinate amount of time, that Ms. Wagner utilized a telephone answering machine to screen her calls in an attempt to regulate Mr. Wagner's telephone visitation with Erika, and that Ms. Wagner had allowed Erika to return to Maryland but had not informed Mr. Wagner of those visits.

34

■ We now turn to the 1994 final Opinion and Order on the merits, from which Ms. Wagner has noted a timely appeal, and in which the trial court, *inter alia*, awarded Mr. Wagner permanent custody of the children based on the *Sanders* [12] criteria for analysis of the best interest of the child. We shall affirm the trial court's award of custody. We explain.

■ At the time of the hearing that gave rise to the November 17, 1994 Order, Erika had been in her father's temporary custody since April of 1992. While Ms. Wagner may still have the right to appeal the 1992 Order, and apparently has attempted to do so, her failure in 1992 to take any action to appeal or otherwise seek modification of the 1992 Order rendered Mr. Wagner Erika's custodial parent and Ms. Wagner her visitor parent. [13] Consequently, it can be argued that the two-fold burden was on *Ms. Wagner* when she sought action by the chancellor in the form of a nullification of his 1992 finding of a material change of circumstances and a resulting return of custody to her. Thus, *she* may have had the burden of proving either that the decision respecting the change in circumstances that resulted in the temporary custody order was wrong or that what had occurred since April 2, 1992 amounted to a material change in circumstances such that Erika's interests would be best served in 1994 by a further modification of the decree. "While custody decrees are never final in Maryland, any reconsideration of a decree should emphasize changes in circumstances which have occurred subsequent to the last court hearing." *Hardisty*, 255 Md. at 439, 258 A.2d 209. We thus analyze the 1994 Order with this in mind.

The trial court in the case at bar conducted a best interest of the child inquiry without indicating whether it found that Ms. Wagner had demonstrated a sufficient change of circum-

---

12. *See Sanders, supra*, 38 Md.App. at 420–21, 381 A.2d 1154. We have previously noted *Sanders*'s factual origins and distinctions. *See supra*, note 9.

13. Indeed, Ms. Wagner had declined visitation with both children between April of 1992 and September of 1993.

stances since 1992 to necessitate same. We have been unable to find any petition by Ms. Wagner alleging a change in the first instance. The existence *vel non* of a new petition, however, is not determinative. Our review of the record reveals that, even if the trial court should have considered the burden of proving change to be appellee's burden and whether the period considered is the time between the 1988 original order and the 1992 temporary order granting temporary custody to Mr. Wagner or the time between the 1988 original order and the 1994 permanent order granting permanent custody of Erika to Mr. Wagner, a material change in circumstances had occurred since 1988, in either instance, so as to warrant a further analysis of the best interest of the child. We have previously determined that the 1992 findings relative to a material change in circumstances was correct. The evidence of materiality is even stronger when the period between 1988 and 1994 is taken into consideration.

In addition to that evidence in 1992 relating to Ms. Wagner's decampment, it is clear that, in the time since Mr. Wagner regained custody of Erika in April of 1992 and the court's 1994 hearing, Erika had been enrolled in a new school and had begun attending therapy sessions with Dr. Libby Mikulski. Dr. Mikulski, a witness whose testimony the trial court accorded great weight in making its decision, testified that she began counseling Erika in 1992: "When she first came to treatment, she was very shy, withdrawn, somewhat anxious.... [W]hen we terminated [treatment], she was much more open, happy, outgoing, seemed to be doing well." The doctor also treated Kris and was able to discern that both children "seemed to be well-adjusted. They seemed to be getting on with their lives, proceeding, going to school, adjusting to their new family." Dr. Mikulski further testified that she had experienced on-going contact and cooperation in the children's progress from Mr. Wagner, but had had no personal contact with Ms. Wagner at all, despite making herself available to her. She added that Erika had told her "that she did lie about the sexual abuse charges, and ... she reported ... that she experienced a lot of guilt about that, and her deepest

desire was to explain to her mother that she lied about that." Dr. Mikulski indicated that she believed that another separation of the children "could be quite anxiety provoking for both of them." While Dr. Mikulski would not comment on Ms. Wagner's fitness *vel non* as a parent, she did point out that Kris had experienced mixed feelings upon visiting with her. While the visits themselves received favorable reviews, they were tempered by Kris's anger and hurt at what he regarded as various broken promises.

Ms. Wagner erroneously contends in her brief that Mr. Wagner still bore the burden of a change in circumstances, citing *Vernon v. Vernon,* 30 Md.App. 564, 354 A.2d 222, *cert. denied,* 278 Md. 737 (1976), in support thereof. Even assuming that Mr. Wagner had the burden, he more than met it; moreover, *Vernon* is inapposite. In *Vernon,* the chancellor, completely disregarding the recommendations of psychological reports that the mother retain custody of the child, awarded custody to the father. On appeal, we disagreed that the father had adequately borne his burden of persuading the chancellor that circumstances were such that the child's welfare required a change of custody; the evidence the father presented lacked substantial support and did not "reflect[ ] so negatively upon [the child]'s welfare as to justify an uprooting from the home environment he ha[d] known since infancy." 30 Md.App. at 568, 354 A.2d 222. We further noted that the chancellor had made no formal findings of fact; in awarding custody of the child to the father, the trial court was acting on a "feeling." We said: "With due regard for the chancellor's discretion, we [could not] agree that a feeling from the heart, in the absence of supporting evidence, is a legally sufficient reason for ordering a change in custody." *Id.* In the case *sub judice,* however, there was ample justification for finding that Ms. Wagner's actions, both before and after 1992, had been detrimental to Erika's well-being and that, in Mr. Wagner's custody, Erika enjoyed a safe, stable, and loving environment. Thus, the trial court was justified in finding both that a material change in circumstances had been shown and that it was in Erika's best interests to remain in Mr. Wagner's

custody. Mr. Wagner met both prongs of the test in both 1992 and 1994.

## III.

**Did the trial court abuse its discretion when on April 2, 1992 it granted appellee "immediate custody" of Erika without making any provisions to protect Erika from the risk of continued sexual abuse and without an evidentiary hearing?**

Ms. Wagner avers that the trial court "abused its discretion in granting [Mr. Wagner] 'immediate custody' without making any provisions to protect Erika from the risk of continued sexual abuse." Mr. Wagner again asserts that Ms. Wagner is time-barred to assert this argument. Even if time were not a factor, however, Mr. Wagner argues that the trial court properly exercised its discretion in awarding him custody of Erika. We agree.

The right to rear one's child has been deemed to be "essential," *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), and encompassed within a parent's "basic civil rights," *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942). Therefore, a court must act with the utmost caution and circumspection in determining to whom a child's custody will be awarded. "[T]he well-being of the child, both present and future, is usually profoundly affected by the court's resolution of the private dispute over who shall be entrusted with its care." *Ross v. Hoffman*, 280 Md. 172, 174, 372 A.2d 582 (1977). Judge Orth summarized the jurisdiction of Maryland courts in respect to child custody cases in *Hoffman*, as follows:

> In Maryland, resolving child custody questions is a function of the equity courts ... [which] may direct who shall have the custody of the child.... This jurisdiction is a continuing one, and the court may from time to time set aside or modify its decree or order concerning the child.
>
> In exercising its jurisdiction over the custody of a child, the equity court performs two different but related func-

tions: child protection and private-dispute settlement. . . .
In performing [these functions,] . . . the court is governed
by what is in the best interests of the particular child and
most conducive to his welfare. This best interest standard
is firmly entrenched in Maryland and is deemed to be of
transcendent importance.

280 Md. at 174–75, 372 A.2d 582 (citations and footnote
omitted); *see also Montgomery County Dep't of Social Servs.
v. Sanders*, 38 Md.App. 406, 417–18, 381 A.2d 1154 (1977);
*Mullinix v. Mullinix*, 12 Md.App. 402, 409, 278 A.2d 674
(1971).

◼ Indeed, the best interest standard has been espoused
by the Court of Appeals as *the* dispositive factor on which to
base custody awards. *See Taylor v. Taylor*, 306 Md. 290, 303,
508 A.2d 964 (1986) (standard is of "paramount concern" and
"transcendent importance"); *Fanning v. Warfield*, 252 Md. 18,
24, 248 A.2d 890 (1969) (standard is the "ultimate test");
*Heaver v. Bradley*, 244 Md. 233, 242, 223 A.2d 568 (1966)
(standard is the "determining factor"); *Young v. Weaver*, 185
Md. 328, 331, 44 A.2d 748 (1945) (standard is the "sole
question"); *Dietrich v. Anderson*, 185 Md. 103, 117, 43 A.2d
186 (1945); *Piotrowski v. State*, 179 Md. 377, 382, 18 A.2d 199
(1941); *see also Robinson v. Robinson*, 328 Md. 507, 519, 615
A.2d 1190 (1992) ("The primary concern to a judge in award-
ing custody to one parent over the other is the best interests
of the child."); *McCready*, 323 Md. at 481, 593 A.2d 1128
("The appropriate standard for determining a contested custo-
dy case is the best interest of the child."); *Raible v. Raible*,
242 Md. 586, 593, 219 A.2d 777 (1966) ("The paramount,
overriding consideration is the welfare of the children.");
*Butler v. Perry*, 210 Md. 332, 342, 123 A.2d 453 (1956) ("[I]t is
too elementary to be stressed that the welfare of the child is
the controlling test in a custody case."); *Leary v. Leary*, 97
Md.App. 26, 36, 627 A.2d 30 (1993) ("The trial judge has the
authority to determine custody, . . . '. . . depending upon what
is in the best interests of the child.' " (quoting *Taylor*, 306
Md. at 301, 508 A.2d 964)); *Kramer v. Kramer*, 26 Md.App.
620, 623, 339 A.2d 328 (1975) ("[T]he best interest and welfare

of the child are determinative."). While a trial court must look at each custody case on an individual basis to determine what will serve the welfare of the child there involved, *Bienenfeld, supra,* 91 Md.App. at 503, 605 A.2d 172, factors that can be used to assist in the trial court's determination include,

> among other things, the fitness of the persons seeking custody, the adaptability of the prospective custodian to the task, the age, sex and health of the child, the physical, spiritual and moral well-being of the child, the environment and surroundings in which the child will be reared, the influences likely to be exerted on the child, and, if he or she is old enough to make a rational choice, the preference of the child.[14]

*Hild v. Hild,* 221 Md. 349, 357, 157 A.2d 442 (1960); *Kramer,* 26 Md.App. at 623, 339 A.2d 328. "The best interest of the child is therefore not considered as one of many factors, but as the objective to which virtually all other factors speak." *McCready,* 323 Md. at 481, 593 A.2d 1128.

 Within this comprehensive framework of authority, the appellate courts of this State practice a limited review of a trial court's decision concerning a custody award. As outlined in *Davis v. Davis,* 280 Md. 119, 125–26, 372 A.2d 231, *cert. denied,* 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 299 (1977), appellate courts employ three methods of review in child custody cases:

> When the appellate court scrutinizes factual findings, the clearly erroneous standard of Rules 886 and 1086 [predecessor to the current Rule 8–131(c) ] applies. If it appears that the chancellor erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the chancellor founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the chancel-

---

**14.** *See Sanders, supra,* 38 Md.App. 406, 381 A.2d 1154, for an even more comprehensive list of criteria.

lor's decision should be disturbed only if there has been a clear abuse of discretion. [Footnote omitted].

*See also Robinson, supra,* 328 Md. at 513, 615 A.2d 1190; *In re Jessica M.,* 312 Md. 93, 110–11, 538 A.2d 305 (1988); *Elza v. Elza,* 300 Md. 51, 55–56, 475 A.2d 1180 (1984); *Hoffman, supra,* 280 Md. at 186, 372 A.2d 582; *Burrows v. Sanders,* 99 Md.App. 69, 75–76, 635 A.2d 82 (1993), *cert. denied,* 335 Md. 228, 643 A.2d 383 (1994); *Lipiano v. Lipiano,* 89 Md.App. 571, 576, 598 A.2d 854 (1991), *cert. denied,* 325 Md. 620, 602 A.2d 710 (1992); *Shunk,* 87 Md.App. at 398, 589 A.2d 1303; *Board of Educ. v. Montgomery County Educ. Ass'n,* 66 Md.App. 729, 741, 505 A.2d 905 (1986), *aff'd,* 311 Md. 303, 534 A.2d 980 (1987); *Mitchell v. Mitchell,* 61 Md.App. 535, 540–41, 487 A.2d 680 (1985); *Swain v. Swain,* 43 Md.App. 622, 626, 406 A.2d 680 (1979); *Sanders,* 38 Md.App. at 419, 381 A.2d 1154; *Christman v. O'Connor,* 36 Md.App. 263, 270, 373 A.2d 326 (1977); *Vernon,* 30 Md.App. at 568, 354 A.2d 222. Indeed, the chancellor's decision is unlikely to be overturned on appeal. *Domingues,* 323 Md. at 492, 593 A.2d 1133; *see also Newkirk v. Newkirk,* 73 Md.App. 588, 591, 535 A.2d 947 (1988) (custody decision is not a matter of the best judgment of the reviewing court). Additionally, the trial court's opportunity to observe the demeanor and credibility of the parties and witnesses is of particular importance. *Petrini v. Petrini,* 336 Md. 453, 470, 648 A.2d 1016 (1994).

▇▇▇ It is readily apparent that Judge Beck, in the case *sub judice,* in his comprehensive thirty-two page Opinion and Order, thoroughly and properly considered the factors that have guided Maryland courts in the resolution of custody matters in reaching the decision that the best interests of the children, Erika in particular, would be served by awarding custody to Mr. Wagner. These findings are supported by the evidence and are not clearly erroneous.

▇▇▇ Ms. Wagner, however, challenges the findings, charging that the court erred in granting Mr. Wagner's *ex parte* motion "without investigating the sexual abuse accusations and without protecting Erika from the risk of further abuse."

We find no merit to these contentions. In making its decision, the trial court noted that it only had the child's welfare at heart. The *parens patriae* power of the equity courts is plenary to afford minors whatever relief may be necessary to protect their best interests. *Wentzel v. Montgomery Gen. Hosp., Inc.,* 293 Md. 685, 702, 447 A.2d 1244 (1982), *cert. denied,* 459 U.S. 1147, 103 S.Ct. 790, 74 L.Ed.2d 995 (1983). The court was not persuaded that Erika was in need of protection from her father. Moreover, Ms. Wagner has pointed to nothing, and our review of the voluminous record reveals nothing, that would indicate that the trial court abused its discretion. Indeed, as the trial court found, all factors point toward the propriety of an award to Mr. Wagner. "[A]n appellate court sits in a much less advantageous position to assure that the child's welfare is best promoted." *Davis,* 280 Md. at 132, 372 A.2d 231. Therefore, we hold that the trial court was not clearly erroneous in determining that Erika's best interests lay with her father and did not abuse its discretion in awarding custody of Erika to him.

## IV.

**Did the court err in failing to acknowledge that appellant was justified in declining to send eight-year-old Erika for grandparent visitation where appellant had reason to believe that Erika would be exposed to the danger of continuing sexual abuse by appellee and such action was against Colorado DSS recommendations and court motion?**

Ms. Wagner asserts that she "was justified in declining to send ... Erika for grandparent visitation which exposed Erika to the danger of continuing sexual abuse" by her father and assigns error to the trial court's failure to acknowledge that she was justified in not complying with its various visitation orders. The visitation orders that she references were issued in February and March of 1992. Mr. Wagner has had custody for over three years. It is clear from the opinion rendered by the trial court after the final hearing that it did

not consider Ms. Wagner's fears justified, and there was ample evidence supporting the trial court's determination. The court, in essence, stated in 1994 that Ms. Wagner's 1992 actions were not justified. In support of her contentions, Ms. Wagner directs our attention to two sources: FL § 9–101 and *Hanke v. Hanke*, 94 Md.App. 65, 615 A.2d 1205 (1992), in which it was found that the trial court erred in granting unsupervised overnight visitation to a father with known pedophilic tendencies. We are not persuaded by either argument.

Moreover, these contentions also arrive to us too late. The order of which Ms. Wagner now complains on appeal involved visitation issues relating to the children's grandparents. After the grant of custody to Mr. Wagner, the prior visitation controversy became moot. Without having immediately sought review of the visitation orders she now attacks, and, after having disobeyed them, Ms. Wagner is without recourse to challenge their underlying merit at this juncture. Even assuming that they are still appealable, with the granting of temporary custody to Mr. Wagner in April of 1992, the time for any sort of meaningful review of the grandparents' visitation rights by this Court has long since passed. That of which appellant complains is, by reason of the passage of time and subsequent proceedings, no longer an issue. Were we to address the issue further, we would affirm.

## V.

**Did the trial court err when it ruled that appellant had voluntarily impoverished herself?**

In determining a parent's child support obligation, the courts will take both actual income, if the parent is employed, and potential income, if the parent is voluntarily impoverished, into consideration. FL § 12–201(b); *see also* FL § 12–204(b)(1). Once a parent is found to be voluntarily impoverished, his or her potential income will be "determined by the parent's employment potential and probable earnings level based on, but not limited to, recent work history, occupational qualifications, prevailing job opportunities, and earnings levels

within the community." FL § 12–201(f). Before a court ventures to determine the level of support to which a child is entitled and, in the process, whether a parent is voluntarily impoverished, it must preliminarily determine that it has the authority to do so by determining the presence *vel non* of a material change of circumstances. FL § 12–104(a) (authorizing a court to "modify a child support award ... upon a showing of a material change in circumstance"); *see also* FL § 12–202(b); *Wills v. Jones,* 340 Md. 480, 667 A.2d 331 (1995); *Walsh v. Walsh,* 333 Md. 492, 497, 635 A.2d 1340 (1994).

> [T]he "change of circumstance" must be relevant to the level of support a child is actually receiving or entitled to receive.... [T]he requirement that the change be "material" limits a court's authority to situations where a change is of sufficient magnitude to justify judicial modification of the support order.... [In so doing,] a court must specifically focus on the alleged changes in income or support that have occurred since the previous child support award. It should generally be unnecessary to inquire into a parent's motivations, intentions, or income-earning capacity....

*Wills,* 340 Md. at 489, 667 A.2d 331 (footnotes and citations omitted). The Court of Appeals has, however, declined to "adopt the rule that ' "voluntary impoverishment" does not constitute a material change of circumstances.' " *Id.* at 490, 667 A.2d 331 (quoting *Wills v. Jones,* 102 Md.App. 539, 548, 650 A.2d 736 (1994)). To adopt such a rule

> would be to leave the voluntarily impoverished parent's child support obligation at a level determined by the salary from his or her last employment.... By its language, although a court may consider additional factors, [FL] § 12–201(f) *requires* a court at least to consider all of the enumerated factors in determining a parent's potential income. If "voluntary impoverishment" always precludes a finding that a material change of circumstance has occurred, a parent's recent work history alone will determine the level of income attributed to the voluntarily impoverished parent. For this reason, the question of a parent's "voluntary impoverish-

ment" must be separated from the determination that a material change of circumstance has occurred. *Id.* at 490, 667 A.2d 331.

 In the case *sub judice*, the trial court found that, upon Ms. Wagner's return to Maryland from California, despite her assertions to the contrary, she easily obtained employment earning her approximately $60,000 per year. She thereafter contracted with RKE Corporation, on June 20, 1993, to provide her services for approximately $20,000 per year. RKE was a corporation in which she held an interest and in which she had the power to at least participate in management decisions. Looking as we must only at the "alleged changes in income or support that have occurred," *id.* at 489, 667 A.2d 331, we perceive that the marked decrease in Ms. Wagner's income was relevant and of sufficient magnitude to constitute a material change in circumstance within the meaning of the statute. Indeed, her "underemployment [may have] significantly alter[ed her] ability to meet the child support obligation," *id.* at 490, 667 A.2d 331, so as to render her voluntarily impoverished and, thus, the trial court was justified in addressing this possibility in determining the amount of support to which Erika and Kris were entitled. We therefore now address the issue of voluntary impoverishment and whether Ms. Wagner was, in fact, voluntarily impoverished, as found by the trial court.

In *Wills, supra,* the Court of Appeals addressed, *inter alia,* the issue of "whether an incarcerated parent should be considered voluntarily impoverished" for purposes of paying child support when the incarcerated parent's income drops substantially as a result of being imprisoned. *Wills,* at 483, 667 A.2d 331. Following a review of the statutory language and legislative history of the child support guidelines, the Court, through Chief Judge Murphy, concluded that, in enacting the guidelines and using the term "voluntary," "the legislature intended that a parent's support obligation can only be based on potential income when the parent's impoverishment is intentional." *Id.* at 494, 667 A.2d 331. In *John O. v. Jane O.,* 90

Md.App. 406, 421, 601 A.2d 149 (1992), we stated that " 'voluntarily impoverished' means: freely, or by act of choice, to reduce oneself to poverty or to deprive oneself of resources *with the intention of avoiding child support or spousal obligations."* (Emphasis added.) The *Wills* Court, however, rejected this definition as "too narrow." *Wills*, at 494, 667 A.2d 331. It continued:

> In determining whether a parent is voluntarily impoverished, the question is whether a parent's *impoverishment* is voluntary, not whether the parent has voluntarily avoided paying child support. The parent's intention regarding support payments, therefore, is irrelevant. It is true that parents who impoverish themselves "with the intention of avoiding child support ... obligations" are voluntarily impoverished. *John O., supra,* 90 Md.App. at 421[, 601 A.2d 149]. But, as the court recognized in *Goldberger* [*v. Goldberger*], 96 Md.App. [313,] 326–27[, 624 A.2d 1328] [ (1993) ], a parent who has become impoverished by choice is "voluntarily impoverished" regardless of the parent's intent regarding his or her child support obligations.

*Id.* (omissions in original); *see also Goldberger*, 96 Md.App. at 327, 624 A.2d 1328 ("[F]or the purposes of the [Child Support] Guidelines, 'a parent shall be considered "voluntarily impoverished" whenever the parent has made the free and conscious choice, not compelled by factors beyond his or her control, to render himself or herself without adequate resources.' "); *Petrini*, 336 Md. at 466, 648 A.2d 1016 ("Whether the voluntary impoverishment is for the purpose of avoiding child support or because the parent simply has chosen a frugal lifestyle for another reason, does not affect that parent's obligation to the child."). The *Wills* Court thus concluded that "[the parent]'s incarceration can only be said to be 'voluntary' if it [the incarceration] was an intended result [of commission of the crime]." *Wills*, at 496, 667 A.2d 331.

■ "To determine whether [a parent]'s impoverishment is 'voluntary,' a court must ... ask whether his [or her] current impoverishment is 'by his [or her] ... own choice, intentionally, of his [or her] ... own free will,' " *id.* (quoting *Allen v.*

*Core Target City Youth Program,* 275 Md. 69, 79, 338 A.2d 237 (1975)), regardless of the motivations therefor. Then,

> [o]nce a court concludes that a parent is voluntarily impoverished, it must then make findings regarding the factors related to potential income. Both issues are left to the sound discretion of the trial judge. The court's factual findings will not be disturbed unless they are clearly erroneous, *In re Joshua W.,* 94 Md.App. 486, 491[, 617 A.2d 1154] (1993), and the rulings based on those findings must stand unless the court abused its discretion. *John O.,* 90 Md.App. at 423[, 601 A.2d 149].

*Reuter v. Reuter,* 102 Md.App. 212, 221, 649 A.2d 24 (1994) (citation omitted).

In the case *sub judice,* the trial court, in its November 17, 1994 Order, stated:

> After considering all evidence presented in light of the holding in *Goldberger v. Goldberger,* 96 Md.App. 313[, 624 A.2d 1328] (1993), the Court concludes that [Ms. Wagner] voluntarily impoverished herself to avoid paying child support. She transferred the only asset which she had to her parents in exchange for minimal consideration. Further, even assuming RKE were a profitable company, the employment contract which she signed called for her to receive an amount equal to one-third of her average income for the prior four years. Considering [Ms. Wagner]'s history of attempting to avoid th[e] Court's orders, the Court concludes that this period of "employment" with RKE amount[ed] to an intentional effort to avoid paying child support.
>
> . . . . .
>
> . . . In short, the Court concludes that [Ms. Wagner] has not "altered her lifestyle to meet her child support obligation." [15]

---

15. The trial court quoted from *Goldberger v. Goldberger,* 96 Md.App. 313, 320, 624 A.2d 1328 (1993), wherein we said: "The law requires . . . [a] parent to alter his or her previously chosen lifestyle if necessary to enable the parent to meet his or her support obligation."

The court then imputed an income of $59,962, an amount equal to the annual income she received for the years 1989 to 1992, commencing her obligation as of June 20, 1993.

The trial court properly evaluated the facts of the instant case in characterizing Ms. Wagner as voluntarily impoverished. As we have said, the relevant inquiry, as clarified by the Court of Appeals in *Wills,* is whether Ms. Wagner brought about her impoverishment intentionally and of her own free will. Evidence adduced at trial indicated that she freely contracted to work for RKE at a salary equal to one-third of that which she had been previously receiving, when, in actuality, she had experienced little trouble securing a position earning her $60,000 per year following her return to Maryland. Further, Ms. Wagner freely transferred her house to her parents for nominal consideration. It appears, therefore, that she acted voluntarily and intentionally in impoverishing herself. The fact that the trial court concluded that Ms. Wagner impoverished herself *with the intention of avoiding paying child support* is of no consequence, as the *Wills* Court determined that parents who act so as intentionally to avoid their child support obligations are within the class of persons who are considered voluntarily impoverished under the statute. What the *Wills* Court went on to say was that this was not a mutually exclusive class—that is, parents who impoverish themselves for reasons not related to their existing child support obligations, if any, will also fall within the class of persons for whom income will be imputed in accordance with the factors outlined in the statute.

Therefore, we discern neither error nor abuse of discretion with the trial court's finding that Ms. Wagner impoverished herself and that that impoverishment—brought about in large part by her substantially decreased employment condition—was brought about intentionally. She was, thus, properly considered to be voluntarily impoverished as contemplated by the statute. The trial court did not abuse its discretion in imputing to her an income commensurate with those positions that Ms. Wagner previously held and that, the court believed, were still attainable.

## VI.

**Did the trial court abuse its discretion when it relied on the statements made by the children at the *in camera* interviews, absent questions establishing their competency?**

The propriety of private in-chambers interviews with children is well-settled in Maryland. *See Shapiro v. Shapiro,* 54 Md.App. 477, 480, 458 A.2d 1257, *cert. denied,* 296 Md. 655 (1983); *Nutwell v. Prince George's County Dep't of Social Servs.,* 21 Md.App. 100, 109, 318 A.2d 563 (1974); *Marshall v. Stefanides,* 17 Md.App. 364, 369, 302 A.2d 682 (1973). The competency of children to testify has often been discussed. "The capacity of children of tender years to testify is a matter ordinarily within the sound discretion of the trial court. The discretion to be exercised by the trial judge must, of course, be exercised by the application of recognized legal principles." *Brandau v. Webster,* 39 Md.App. 99, 104, 382 A.2d 1103 (1978) (citations omitted). "[I]n each case the traditional test is whether the witness has intelligence enough to make it worthwhile to hear him at all and whether he feels a duty to tell the truth." *Id.*

In *Brandau,* a case relied on by both parties, the trial court refused to permit the parties' five-year-old daughter to testify in that custody case; it was conceded that her testimony was material to the outcome of the case. The trial court based its refusal on its observations of the child in the courtroom. We remanded for performance of an examination of the child's competence. We opined: "The competency of a witness is established when it is determined that the witness has sufficient understanding to comprehend the obligation of an oath and to be capable of giving a correct account of the matters which he has seen or heard relevant to the question at issue." *Id.* We cited with approval *Artesani v. Gritton,* 252 N.C. 463, 113 S.E.2d 895, 897 (1960), wherein it was said that " 'the test of competency is not age but capacity to understand and relate under the obligation of an oath a fact or facts which will assist the [fact finder] in determining the truth with respect to the

ultimate facts which it will be called upon to decide.' " *Id.* at 105, 382 A.2d 1103 (citations omitted from original).

■ In the case *sub judice,* Ms. Wagner has waived any appellate challenge to the trial court's *in camera* interviews with Erika and Kris for two reasons: first, it was she who asked the court to conduct the interviews and, second, no objection was noted prior to or immediately after the trial court acceded to her request and questioned the children. We explain.

■ The trial court interviewed the children on February 22, 1992 and, again, on September 29, 1994. With respect to the first interview, the trial court noted that Ms. Wagner's attorney "asked that the Court interview the two children." No mention at all was made of the children's competency *vel non* to speak with the court *in camera,* and no objection was interposed in respect thereto. *See Shapiro, supra,* 54 Md. App. at 480, 458 A.2d 1257 (to preserve issues respecting *in camera* interviews for appeal, objections must be noted on the record or be waived). On September 29, 1994, it was Ms. Wagner's attorney who raised the issue regarding the parties' ability to submit to the court proposed questions to be asked of the children. Despite having "made a list," Ms. Wagner's attorney chose not to submit anything following her discussion with the court. No other mention was made in respect to the children' competency and, again, no objection directed the court's attention thereto. *See id.* Moreover, our review of the record reveals that the Domestic Relations Master, in 1987, was also asked to question the children, then five and two years of age. The Master refused, citing their youth, and while it is not clear who proffered the children's testimony, it appears that the parties have long desired for the court to hear what the children felt about their family condition. While the trial court did not conduct an examination on the record of the children's testimonial competence, it appears clear that he believed them to be capable of "understanding ... the obligation of an oath and ... [of] giving a correct account of the matters ... relevant to the question at issue."

*Brandau,* 39 Md.App. at 104, 382 A.2d 1103. Moreover, we presume judges to know the law and apply it, even in the absence of a verbal indication of having considered it. *Reuter, supra,* 102 Md.App. at 244, 649 A.2d 24; *John O., supra,* 90 Md.App. at 429, 601 A.2d 149. We hold, therefore, that the trial court did not abuse its discretion in questioning the children, either on February 22, 1992 when they were ten and seven years old, or on September 29, 1994, when they were thirteen and ten years old.

Simply stated, Ms. Wagner cannot offer the children as competent witnesses to the court and then assign error to the court's acceptance when the children's testimony is not favorable to her. Ms. Wagner received that for which she asked, and she cannot now come before us and argue that it was in error.

## VII.

**Did the trial court abuse its discretion in assessing counsel fees against appellant where the court failed to make the findings mandated by statute, Md.Code, Family Law Art. § 12–103, to justify such assessment?**

 Ms. Wagner bases her claim, that the trial court improperly assessed Mr. Wagner's counsel fees against her, on FL § 12–103 (1995 Cum.Supp.). That section reads, in pertinent part:

(a) *In general.*—The Court may award to either party the costs and counsel fees that are just and proper under all the circumstances in any case in which a person:

(1) applies for a decree or modification of a decree concerning the custody, support, or visitation of a child of the parties. . . .

. . . .

(b) *Required considerations.*—Before a court may award costs and counsel fees under this section, the court shall consider:

(1) the financial status of each party;

(2) the needs of each party; and

(3) whether there was substantial justification for bringing, maintaining, or defending the proceeding.

(c) *Absence of substantial justification.*—Upon a finding by the court that there was an absence of substantial justification of a party for prosecuting or defending a proceeding, and absent a finding by the court of good cause to the contrary, the court shall award to the other party costs and counsel fees.

Ms. Wagner asserts that the trial court failed to consider the fact that the loss of her security clearance caused a substantial decrease in her income, that she was "justified in defending the custody proceedings to protect Erika from the risk of further sexual abuse," and that she was living with her parents and using their car at the time of the hearing. She further claims that Mr. Wagner possesses the financial wherewithal to pay for the services rendered by his counsel. In short, she looks to subsection (b) of FL § 12–103 to support her claim. We hold that the counsel fees were properly assessed. We explain.

*In toto,* the trial court ruled as follows in respect to Mr. Wagner's attorney fee claim:

[Mr. Wagner]'s counsel has submitted bills for services rendered since the divorce trial in 1988 which total in excess of $20,000.00. As has been set forth *supra,* the Court concludes that many of the proceedings necessitated in this case were the result of [Ms. Wagner]'s unreasonable conduct. The Court previously entered a judgment against [Ms. Wagner] on July 29, 1992 representing the costs incurred by [Mr. Wagner] when she went "underground." Since then, [Mr. Wagner] has been forced to incur additional unnecessary fees including those surrounding [Ms. Wagner]'s refusal to pay child support as a result of her voluntary impoverishment.

After considering the respective financial situations of the parties in light of [Ms. Wagner]'s unreasonable conduct, the Court concludes that [Mr. Wagner] is entitled to a contribu-

tion from [Ms. Wagner] in the amount of $2,500.00 toward his attorney's fees.

Having determined on the record that Mr. Wagner was justified in defending against Ms. Wagner's countless machinations, and finding that no good cause to explain her "unreasonable conduct" existed the trial court did what it was mandated to do, per FL § 12–103(c). We are cognizant of no reason to disturb the exercise of the court's discretion. Since Ms. Wagner does not dispute the amount of the fees awarded, but rather its assessment in the first instance, we decline to address this issue further.

## VIII.

**Did the trial court abuse its discretion when it denied appellant's request to transfer this case to Anne Arundel County?**

Ms. Wagner assigns error to the trial court's refusal to transfer the case to Anne Arundel County. Maryland Rule 2–327(c), on which she based her motion, reads:

**(c) Convenience of the Parties and Witnesses.** On motion of any party, the court may transfer any action to any other circuit court where the action might have been brought if the transfer is for the convenience of the parties and witnesses and serves the interests of justice.

The trial court enjoys wide discretion in determining whether to transfer an action on the grounds of *forum non conveniens,* and the reviewing court should be reluctant to substitute its judgment for that of the trial court. *Urquhart v. Simmons,* 339 Md. 1, 660 A.2d 412 (1995), *rev'g Simmons v. Urquhart,* 101 Md.App. 85, 643 A.2d 487 (1994).

In ruling on Ms. Wagner's motion, the trial court stated:

This case has been pending in Carroll County for over seven years. There are open items still pending before the Court as a result of hearings in April not being held. . . .

. . . I've considered the convenience and fairness issues, the interest of justice, and [the] Motion[ ] for Transfer [is] denied.

The trial court clearly did not abuse its discretion in retaining in Carroll County a case that had begun there in 1987. A transfer would have required that a new court acquaint itself with the voluminous record that has characterized the instant case.

**JUDGMENT OF THE CIRCUIT COURT FOR CARROLL COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**